United States Court of Appeals
Fifth Circuit

**F I L E D**

June 2, 2006

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 04-60956

MELISSA WHITING,

Plaintiff-Appellant,

VERSUS

THE UNIVERSITY OF SOUTHERN MISSISSIPPI; SHELBY THAMAS, Dr.;
DANA THAMES, Dr.; CARL MASTRAY, Dr.;

Defendants-Appellees

Appeal from the United States District Court
For the Southern District of Mississippi

Before HIGGINBOTHAM, WIENER, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Dr. Melissa Whiting was a non-tenured professor at the University of Southern Mississippi ("USM"), whose annual evaluations and third-year review were consistently excellent. Nonetheless, she was denied tenure and promotion at the end of her sixth year at USM after participating in the tenure application process laid out in the Faculty Handbook. Dr. Whiting alleges that the denial arose from ill will between her and her department chair, Dr. Thames, the daughter of the USM president. Accordingly, Dr. Whiting sued on several constitutional claims under 42 U.S.C.

§ 1983 and on state law-based contracts issues. The district court dismissed the constitutional claims on a motion for summary judgment and remanded the state-law claims to state court. Dr. Whiting now appeals.

Because Dr. Whiting has failed to establish genuine questions of material facts for key elements of her due process, equal protection, and First Amendment retaliation claims under 42 U.S.C. § 1983, we affirm the district court's motion for summary judgment.[1] As the only issues remaining are therefore questions of state contract law, we find no abuse of discretion in the district court's order remanding those claims to state court.

BACKGROUND

In September 1996, Dr. Melissa Whiting became an assistant professor in the Department of Curriculum, Instruction, and Special Education in the College of Education and Psychology at USM. In May 1997, the Board of Trustees of the State Institutions of Higher Learning approved her for tenure-track status. From 1996-2002, Dr. Whiting and the Board executed nine-month employment contracts for each of the six academic years that fell during that period. Those contracts state that they are subject to the "laws of the State of Mississippi and the policies and bylaws of the Board."

---

[1] Appellees also argue that they are not parties susceptible to suit under § 1983. Because Dr. Whiting has clearly failed to establish constitutional claims valid under § 1983, we do not address this issue.

2

As a member of the USM faculty, Dr. Whiting received the Faculty Handbook and the College of Education and Psychology Policy and Procedures for Tenure and Promotion. These handbooks contain language that notes "these procedures collectively constitute contractual due process -- the sum total of the procedural guarantees explicit and implicit [in the tenure process]." The Faculty Handbook further provides for annual evaluations and, for tenure-track faculty, a third year review. The Handbook also states that successful tenure reviews neither promise nor guarantee eventual tenure, which is only obtained by discretionary grant of the Board of Trustees. The Faculty Handbook also states that decisions regarding tenure are normally communicated to the applicant by May 1.

During her time at USM, Dr. Whiting received five annual evaluations, and in each received the highest marks in the categories of teaching, research, and service. These same categories are used as criteria in evaluating suitability for tenure and promotion. Defendants Dr. Dana Thames and Dr. Carl Martray prepared, reviewed, and/or signed each annual evaluation. Dr. Whiting also underwent a third year review, based on the same criteria, and again received top marks in the above categories.

At the beginning of her sixth year of employment, Dr. Whiting submitted herself for consideration for both tenure and promotion (to associate professor). As part of the process, she submitted a dossier documenting her suitability for tenure and promotion. The

3

dossier focused on the three major areas highlighted in her prior evaluations: teaching, scholarship and publication (research), and service. Dr. Whiting alleges that her department chair, Dr. Thames, intentionally provided Dr. Whiting with flawed advice, ordering her not to include certain research materials in her dossier. Dr. Whiting further alleges that during the tenure process Dr. Thames and another faculty member, Dr. Reeves, "began a quest to scuttle [her] career," by intimating that Dr. Whiting had committed academic fraud. Dr. Whiting further alleges that Dr. Thames sought to isolate Dr. Whiting through departmental cliques and by placing her in a separate building from the rest of the faculty. She also alleges that Dr. Thames was displeased by Dr. Whiting's remarks about student rights that reflected poorly on Dr. Thames' administration of the department.

USM's review of Dr. Whiting's application began with a committee of faculty from her department. At their meeting, questions arose over certain articles listed in the publication section of her dossier. The committee chair and Dr. Thames met with Dr. Whiting and requested a written response to these questions. Dr. Whiting submitted her response, including an explanation of the methodology and analysis used to write several of her published articles. After the committee reconvened and considered her response, it voted to award promotion, with six in favor, three against, and two abstentions. The committee voted against awarding tenure, however, with six against, four in favor, and one

4

abstention. The committee's summary report notes a general agreement that Dr. Whiting wait to request tenure until she had completed her sixth year of teaching (a tenure candidate may request deferral of the tenure process until the seventh year of employment).

Both the committee chair and Dr. Thames notified Dr. Whiting by separate letter of the committee's conclusions and suggested that she consider withdrawing her request for early tenure. Dr. Thames prepared a written recommendation to the Dean of the College of Education and Psychology, Dr. Carl Martray, regarding the committee's decisions. In that report, Dr. Thames expressed her agreement with the committee's concerns, but informed him that Dr. Whiting still wished to move forward with both the tenure and promotion processes.

Dr. Whiting's dossier, as well as the recommendation to Dean Martray and a rebuttal letter from Dr. Whiting, came before the College Advisory Committee ("CAC"), a group of representatives from each department in her College. The CAC noted the disparity between Dr. Whiting's high marks in her annual evaluations and the "more negative" report of the tenure and promotion committee. After undertaking its own review of Dr. Whiting's credentials, the CAC concluded "that it appeared that the annual evaluations of the chairs in the past were more optimistic than the credentials justified during many of the years." The CAC's report noted concerns that Dr. Whiting's body of work at that time "was not

5

adequate and did not meet college research standards." The CAC voted to deny tenure and promotion, each vote tallying to four against and two in favor, with no abstentions. Dean Martray reviewed the CAC recommendations and Dr. Whiting's dossier, concluding that he had "no compelling reason to recommend against the CAC's determination." He transmitted Dr. Whiting's materials to the Provost, without recommendation for either promotion or tenure. Dean Martray notified Dr. Whiting of his decision and included the copies of the CAC's reports, reminding her that she retained the option to withdraw her application and request deferral to her seventh year.

Dr. Whiting chose to continue with the promotion and tenure process. Accordingly, her dossier came before the University Advisory Council ("UAC"). The UAC met twice to review her materials. On the advice of her attorney, Dr. Whiting declined invitations to attend these meetings, and presented UAC members with a letter alleging failures of due process and violation of her due process rights under the Fourteenth Amendment. Ultimately, the UAC voted to award tenure (five voted in favor, three against, and one recusal), but did not reach a conclusion as to promotion (four in favor, four against, and one recusal). Those votes, in addition to another supplementary letter from Dr. Whiting, were then submitted to the Provost, who concurred with the UAC's recommendation as to tenure, and further recommended promotion. He notified Dr. Whiting of his recommendation by letter on May 17,

6

2002.

Dr. Whiting's dossier thus came before University President Shelby Thames, father of Dr. Dana Thames, who had taken that office on May 1, 2002. On August 23, 2002, President Thames wrote to request a meeting with Dr. Whiting to discuss concerns about her application. Dr. Whiting chose not to meet with President Thames. On August 30, 2002, President Thames wrote to Dr. Whiting to inform her that he would not recommend her to the USM Board of Trustees for tenure or promotion. That letter further gave notice that Dr. Whiting's employment at USM would not be renewed after the academic year ending May 2003.

Dr. Whiting appealed to the Board of Trustees on September 16, 2002. In forwarding her request to the Board, the Commissioner of Education recommended that the Board decline to consider the appeal. The Board did so unanimously, because Dr. Whiting had already filed suit, and notified Dr. Whiting of its decision by letter to her attorney on November 21, 2002.

PROCEDURAL HISTORY

On August 6, 2002, Dr. Whiting filed the instant suit in the Circuit Court of Forrest County, Mississippi. Dr. Whiting complained of violations of her constitutional rights, as protected by section 1983 of the Civil Rights Act, claiming deprivation of substantive and procedural due process, and of rights guarded by

7

the Equal Protection clause and the First Amendment.[2] She also raised breach of contract and other claims under state law. She sought punitive damages, injunctive relief, and any other relief, including attorneys' fees, to which § 1983 entitled her.

Defendants timely removed to federal court, and moved for summary judgment on September 13, 2004. The district court granted the motion as to all federal claims, remanding the remaining state-law claims to state court. Dr. Whiting appeals both the award of partial summary judgement and the remand of the state-law claims.

STANDARD OF REVIEW

This court reviews the district court's summary judgment ruling de novo. Hanks v. Transcon. Gas Pipe Line Corp., 953 F.2d 996, 997 (5th Cir. 1992). Summary judgment is appropriate where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party. Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Huckabay v. Moore, 142 F.3d 233, 238 (5th

_____

[2] 42 U.S.C. § 1983 allows suit against any person who "who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

Cir. 1998). Where the non-moving party fails to establish "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," no genuine issue of material fact can exist. <u>Celotex</u>, 477 U.S. at 322-3.

Where a case is before the court under federal question jurisdiction, pendent-claim jurisdiction over state law claims exists where there is a "common nucleus of operative fact." <u>United Mine Workers of America v. Gibbs</u>, 383 U.S. 715, 725 (1966). While the federal courts have power to hear cases in such circumstances, they may exercise discretion over whether or not to exert that power. <u>Id.</u> at 726. Consequently, this court reviews the district court's remand of the state law claims for abuse of discretion.

DR. WHITING'S § 1983 CLAIMS

Dr. Whiting asserts due process, equal protection, and First Amendment claims through 42 U.S.C. § 1983. As she fails in each instance to establish a genuine issue of material fact on various elements of these claims, the district court properly granted summary judgment on all of her 42 U.S.C. § 1983 claims.

A. Due Process Claims

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." <u>Bd. of Regents of State Colls.</u>

9

v. Roth, 408 U.S. 564, 566-7 (1972). Similarly, substantive due process offers protection to an individual only if that person has either a "constitutionally protected property interest," Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 222 (1985), or a similarly protected liberty interest. Kelley v. Johnson, 425 U.S. 238, 244 (1976). To determine whether either procedural or substantive due process safeguards apply, we must examine the interest at stake to determine whether it falls within the Fourteenth Amendment's protections. Id. at 571.

### i. Protected Property Interest

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Roth, 408 U.S. at 576. The person must have a legitimate claim to those benefits, not simply an abstract need or unilateral desire. Id. To determine if property rights exist, the court must look to state law. Id. at 578; see also, Bishop v. Wood, 426 U.S. 341, 344 (1976) (discussing the issue in the specific context of employment law).

Mississippi law is clear that neither state legislation nor state regulations create a legitimate expectation of continued employment for a non-tenured faculty member:

> Section 37-101-15(f) [Miss. Code Ann.]...empowers the Board of Trustees to terminate employment contracts at any time for malfeasance, inefficiency or contumacious conduct, but does not create a legitimate expectation of continued employment for a non-tenured employee.

10

> Just as there is no protected interest which arises from Mississippi statutes, there is none which arises from state regulations.
>
> Nor does the written tenure policy of MVSU create or confer an expectation of continued employment.

<u>Wicks v. Miss. Valley State Univ.</u>, 536 So.2d 20, 23 (Miss. 1980) (internal citations omitted). Furthermore, the Mississippi Supreme Court has held that positive annual reviews do not serve to generate a property interest in tenure. <u>Id.</u> at 24 (citing <u>Staheli v. Univ. of Miss.</u>, 854 F.2d, 121, 126 (5th Cir. 1988)).

Dr. Whiting argues, however, that the tenure procedures in the handbook state that if, in her annual evaluations and third year review, she meets or exceeds the criteria used for evaluation, then "she is to be tenured." <u>Appellant's Brief</u> at 21. This flat guarantee, she asserts, is sufficient to create a property interest. Language in the Faculty Handbook, however, consistently reiterates that promotion and tenure are not guaranteed, even by positive performance reviews: the Handbook states, for example, "[p]romotion in academic rank is not guaranteed by contracted employment or earned solely by the duration of employment" and "[t]he privilege of tenure is not guaranteed by tenure-track appointment, by prior promotion in academic rank, or by duration of employment." Further, as the district court noted: "the same faculty handbook reiterates that, notwithstanding the procedures, tenure is awarded at the discretion of the board of trustees upon nomination by the president." Given such language and existing state law precedent, we cannot construe an expectation of continued

11

employment sufficient to generate a protected property interest.

Since Dr. Whiting's interest in her continued employment does not make for a viable due process claim, she may only claim a due process violation if she has some other property interest in a benefit afforded by her current contract with the state university. A mere breach of contract will not suffice for an action under § 1983 without a violation of due process rights. Bishop, 426 U.S. at 349-350. While a plaintiff may have an action in state court for damages for breach of contract, he may not sue under § 1983 unless his constitutional rights have in some way been denied or his exercise of those rights penalized in some way. Id.

Dr. Whiting argues that she has been deprived of the property interest arising from her contractual right to the promotion and tenure procedures laid out in the handbook. Again, to determine if property rights exist, the court must look to state law. Mississippi courts have held that contract rights constitute enforceable property rights. Univ. of Miss. Med. Ctr. v. Hughes, 765 So.2d 528, 536 (Miss. 2000) (citing Wicks, 536 So.2d at 23 (Miss. 1988)). "[I]t is federal constitutional law[, however,] which determines whether that property interest rises to the level of a constitutionally protected interest." Hughes, 765 So.2d at 536. Certain contract situations, however, such as a "public college professor dismissed from an office held under tenure provisions," or "staff members dismissed during the terms of their contracts," have contractual rights creating "an interest in

12

continued employment that [is] safeguarded by due process." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 566-7 (1972) (citing respectively, Slochower v. Bd. of Education, 350 U.S. 551 (1956), and Wieman v. Updegraff, 344 U.S. 183 (1952)).

Mississippi courts have held that employee manuals become part of the employment contract, creating contract rights to which employers may be held, such as Dr. Whiting's right to the procedures outlined in the handbooks. Robinson v. Bd. of Trustees of E. Cent. Junior Coll., 477 So.2d 1352, 1353 (Miss.1985); see also, Bobbitt v. The Orchard Dev. Co., 603 So.2d 356, 361 (Miss. 1992). The 5th Circuit has held that where a property right to procedural protections existed under state law, those procedural guarantees constituted a property interest protected under due process. Samuel v. Holmes, 138 F.3d 173, 177 (1998) (analyzing a non-tenured employee's claim where a Louisiana statute directed school districts to promulgate policies for dismissal of such employees; claimant had property interest in procedural guarantees). However, even if Dr. Whiting's contractual rights are sufficient to constitute a property interest warranting due process protection, it is not clear that she has adequately alleged any sort of deprivation. Indeed, reviewing the history of her tenure application suggests that she has been afforded the processes guaranteed her.

Potential deficits arise in three areas. First, Dr. Whiting alleges that "[s]he [was] entitled to a presidential decision by

13

May 1 [of 2002, the end of the academic year in which she applied for tenure]" but that the President did not reach a decision until late August 2002. The Faculty Handbook, however, states "Presidential decisions are normally communicated to affected parties by May 1." The word "normally" suggests that there may be times at which circumstances mandate a different date may apply: in this case, President Thames did not assume office until May 1, 2002; furthermore, the provost's review was not itself completed until May 17, 2002.

Second, Dr. Whiting argues that the policies laid out in the Faculty Handbook create an "automatic" process, guaranteeing tenure to one who meets or exceeds the criteria applied during annual and third-year reviews. Because the handbook's procedures are incorporated into her contract, her contract rights warrant due process protection, and she has met or exceeded the criteria, Dr. Whiting argues she is therefore contractually guaranteed tenure. This argument fails for reasons already discussed supra: the language in the Faculty Handbook emphasizes that the ultimate decision for tenure lies in the Board's hands, and that positive evaluations do not guarantee a grant of tenure.

Third, Dr. Whiting argues that the tenure and promotion procedures create a de facto tenure program such that she has a protected interest in her continued employment. She relies on Perry v. Sindermann, in which the Supreme Court held that "[a] teacher...who has held his position for a number of years, might be

14

able to show from the circumstances of this service--and from other relevant facts--that he has a legitimate claim of entitlement to job tenure" such as would support a due process claim, even though the state college at which he was employed had no formal tenure program. 408 U.S. 593, 602 (1972). Dr. Whiting's case, however, is distinguishable from the facts of Perry: USM clearly has a formal tenure process, and as discussed above, emphasizes that the final decision on tenure remains at the discretion of the Board of Trustees, notwithstanding the results of annual and third-year evaluations. Thus her argument arrives at the same result as above: where a tenure policy exists, non-tenured university employees under Mississippi law do not have a property interest in their continued employment that warrants protection under the due process clause.

Dr. Whiting therefore fails to establish a genuine question of material fact as to whether she has been deprived of any property interest. Accordingly, her due process clause claims, both substantive and procedural, fail insofar as they are based on deprivation of a property interest.


### ii. The Protected Liberty Interest Claim

Protected liberty interests include the freedom to work and earn a living. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972). "There [may] be cases in which a State refused to re-employ a person under such circumstances that interests in

15

liberty would be implicated." Id., 573. To determine if a public employee has been deprived of a protected liberty interest, this court must find that he was either:

> terminated for a reason which was (i) false, (ii) publicized, and (iii) stigmatizing to his standing or reputation in his community or [] terminated for a reason that was (i) false and (ii) had a stigmatizing effect such that (iii) he was denied other employment opportunities as a result.

Cabrol v. Town of Youngsville, 106 F.3d 101, 107 (5th Cir. 1997) (citing Bd. of Regents of State Colls., 408 U.S. at 564; Codd v. Velger, 429 U.S. 624, 627, 628, (1977) (per curiam); Moore v. Miss. Valley State Univ., 871 F.2d 545, 549 (5th Cir. 1989); Wells v. Hico I.S.D., 736 F.2d 243, 256-57 (5th Cir.1984).

The district court found that Dr. Whiting had been accused of academic fraud; the veracity of that accusation is central to this suit. Neither party disputes that such an accusation would have a stigmatizing effect for a university professor.

Dr. Whiting alleged that she had lost job opportunities due to the denial of tenure, but, as the district court noted, did not (and does not) allege that she lost the opportunities because of the false and or stigmatizing information contained in her file. As we have stated before, "[w]hile it is generally understood that the loss of a job can be stigmatizing in itself, the law requires more to find a liberty deprivation." Cabrol, 106 F.3d at 107 (citing Wells, 736 F.2d at 258).

Dr. Whiting does argue that she has suffered a reputational loss within her community; viz., USM. The question is whether she

16

has raised a genuine question of material fact as to whether the accusations were publicized. To avoid summary judgement based on appellant's argument, Dr. Whiting must show that "'the governmental agency has made or is likely to make the...stigmatizing charges public "in any official or intentional manner, other than in connection with the defense of [the related legal] action."'" <u>Wells v. Hico I.S.D.</u>, 736 F.2d 243, 255 (5th Cir. 1984) (quoting <u>Ortwein v. Mackey</u>, 511 F.2d 696, 699 (5th Cir. 1975)). This court has previously held that

> the mere presence of defamatory information in confidential personnel files does not amount to a violation of one's liberty rights. <u>See</u> <u>Walker v. Alexander</u>, 569 F.2d 291, 294 (5th Cir.1978); <u>Ortwein v. Mackey</u>, 511 F.2d 696, 699 (5th Cir.1975); <u>Sims v. Fox</u>, 505 F.2d 857, 864 (5th Cir.1974) (en banc), cert. denied, 421 U.S. 1011(1975). However, where the information contained in the allegedly confidential files is clearly false, and there is a possibility that the information will not be kept confidential, we have held that an evidentiary hearing is required to determine the issues of confidentiality and the potential prejudice to the plaintiff's standing in the community and to his employment opportunities. <u>Swilley v. Alexander</u>, 629 F.2d 1018, 1022 (5th Cir. 1980).

<u>Burris v. Willis Indep. Sch. Dist., Inc.</u>, 713 F.2d 1087, 1092 (5th Cir. 1983).

Dr. Whiting claims that adequate publication had occurred via preparation of transcripts and cites the record in stating that Defendants concede that at least 30 people, all of whom were participants in the tenure and promotion process, heard the allegation during the tenure and promotion process. She also argues that no evidence has been offered to suggest that those thirty

17

people were in any way precluded from discussing the accusation. Furthermore, she argues, the information had been placed in her file, leaving it accessible to other potential employers, and the information "spread by Dana Thames through the Department, the College, and the University." In her deposition, however, Dr. Whiting concedes that although she had discussed the facts of her suit with people outside of USM, she had no knowledge of whether defendants had discussed her case with anyone outside of the tenure and promotion process.

Any distribution of the information regarding the charges against Dr. Whiting thus seems confined to the setting in which they were made - the hearings for the tenure process - and to Dr. Whiting's personnel file. Dr. Whiting does not point to any concrete manner in which defendants have published or will publish, in an official or intentional manner, the alleged accusations outside of the various tenure committees. Cf., Burris, 713 F.2d 1087, 1092-3 (5th Cir. 1983). Furthermore, in her deposition Dr. Whiting denied any knowledge that the defendants had disseminated the charges against her outside of the tenure process. Dr. Whiting therefore has not created a material question of fact as to whether the defendants acted in any official or intentional manner to publicize the alleged accusations regarding academic fraud.

Dr. Whiting thus does not meet the requirements that warrant finding deprivation of a liberty interest. Since she cannot assert that claim, nor claim deprivation of a property interest, the

18

District Court correctly granted summary judgment against her on her due process claims.

B. The Equal Protection "Class of One" Claim

Under the standard set out in Vill. of Willowbrook v. Olech, 528 U.S. 562 (2000), for a "class of one" claim to withstand summary judgment, Dr. Whiting must have established genuine questions of material fact as to whether 1) "she was intentionally treated differently from others similarly situated" in the tenure process and 2) if different standards for tenure were applied, "that there [was] no rational basis for the difference in treatment."[3] Id. at 564.

In support of her claim, Dr. Whiting reviewed the CVs of other professors who had traversed the process and received tenure at USM. She argues that her dossier documents a far greater array of accomplishments than possessed by others who had received tenure. All but two of these professors, some of whom belonged to other departments of the university, had gone through the tenure process at different times, were evaluated by different committees, and sought different positions than Dr. Whiting. Of the remaining two, one came from a different department, and the other worked in a different area of teaching and research. Dr. Whiting does not

---

[3] Rational basis scrutiny is used because Dr. Whiting does not contend that she is a member of a suspect or protected class. Delahoussaye v. City of New Iberia, 937 F.2d 144, 149 (5th Cir. 1991).

19

contest that both she and other tenure applicants are evaluated under the three handbook criteria of teaching, research, and service. Instead, she argues that those individual criteria were applied differently to her such that she had to meet a different set of requirements.

To evaluate her arguments, we must first determine whether or not Dr. Whiting, in her CV review, trawled a pool of similarly situated individuals. She argues that acceptable breadth of comparison is wide, encompassing all faculty at the university who apply for tenure at USM at any time, as all are subject to the same procedures and criteria for tenure. Appellees, by contrast, argue that applicants who underwent tenure evaluation at a different time, in a different field of expertise, are not thought of as similarly situated to Dr. Whiting given the wide-ranging differences in what might constitute, for example, consistently high quality research within different disciplines or at different points in USM's history. The argument seems to narrow the field too finely, however.

Precedent from this court suggests that at somewhat broader scope is more appropriate. See, e.g., Levi v. Univ. of Tex. at San Antonio, 840 F.2d 277, 280 (5th Cir. 1988) (in which the court accepts without argument that two professors applying for tenure in the same "division" at the same time were similarly situated when one taught sociology and one psychology). Even accepting this standard as setting the breadth of comparison, Dr. Whiting compares

herself to at least one other person in her department, who applied for tenure at the same time. Assuming, arguendo, that Dr. Whiting has met her burden for establishing different treatment of similarly situated individuals, she must also have shown that there was no rational basis for the decision to deny tenure.

To withstand a motion for summary judgment, however, Dr. Whiting must have established that a genuine issue of material fact exists as to whether any rational basis could exist for the government's action. See, Celotex Corp. v. Catrett, 477 U.S. 317, 322-3 (1986) (establishing standard for non-moving party in summary judgment motion); Bd. of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. 356, 367 (2001) ("the burden is upon the challenging party to negative '"any reasonably conceivable state of facts that could provide a rational basis for the classification."' (quoting Heller v. Doe, 509 U.S. 312, 320 (1993), in turn quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)); see also, Levi, 840 F.2d at 280 ("the rational-basis test generally requires only that the relation to the state's purpose be 'at least debatable'"). In applying this test to equal protection claims regarding tenure decisions, this court has held that

> [the test] does not permit a judge or jury simply to second-guess University officials' academic judgment concerning a tenure decision...To the extent a decision concerning a teacher's or student's academic performance requires "an expert evaluation of cumulative information," it lends itself poorly to judicial review. Levi, 840 F.2d at 280 (internal citations omitted).

In Levi, the plaintiff alleged an equal protection violation

21

where undue emphasis had been placed on his tendency to grade too leniently, a focus not used in evaluating another professor for tenure. Id. Plaintiff first challenged the rationality of the grounds on which the university based his denial of tenure. He alleged a number of irrational grounds for this discrepancy in treatment, and asserted the inference that the university had given out rational grounds for his dismissal as "a pretext for a decision actually taken out of irrational ill-will". Id. at 281. Nonetheless, the court found that in each case the university proffered a debatably rational justification. Id. In these circumstances, this court held that the plaintiff had failed to show that the university's behavior was irrational, even where such behavior may have appeared unwise. Accordingly, the court granted a motion for directed verdict against the plaintiff, noting that such decisions "call[] for the exercise of professional judgment, and a reasonable jury could not find that the University officials failed to exercise that judgment or ventured 'beyond the pale of reasoned academic decision-making.'" Id.

The instant case is similar. Dr. Whiting is alleging that different standards were applied to evaluate her under the "research" portion of the tenure criteria. She further alleges that the rational reasons put forth by the defendants are no more than pretext for the underlying, irrational reason for her denial of tenure, i.e., President Thames's purported bias against her as a result of the ill will his daughter, Dr. Thames, bore her. As in

22

Dr. Levi's case, however, "[a]ll of these decisions were at least debatable, and none reveals a failure to exercise professional judgment." Id. at 281. Dr. Whiting has thus failed to meet her burden of proof on that standard when under summary judgment review.

C. The First Amendment Retaliation Claim

Finally, Dr. Whiting alleges that she has been denied tenure in retaliation for an alleged ruling against Dr. Thames while sitting on a panel reviewing student grievances against administrative actions.[4] Succeeding on a First Amendment retaliation claim requires that Dr. Whiting show

> (1) she suffered an 'adverse employment decision'; (2) her speech involved 'a matter of public concern'; (3) her 'interest in commenting on matters of public concern...outweigh[s] the Defendant's interest in promoting efficiency'; and (4) her speech motivated the adverse employment decision [i.e., a causal connection]. Beattie v. Madison County Sch. Dist., 254 F.3d 595, 601 (5th Cir. 2001) (citing Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 220 (5th Cir.).

Defendants argue that Dr. Whiting has not offered any evidence that her conduct was a motivating factor in her discharge. See Beattie, 254 F.3d at 605 (such a failure resulted in a motion for summary judgment against the plaintiffs). The question focuses on whether a causal connection existed between her conduct and her

---

[4]In her Reply Brief, Dr. Whiting also raises a First Amendment claim that she suffered an adverse employment decision because of her association with other professors in the Department for whom Dr. Thames cared little. As the argument was not raised until her reply brief, it is not considered here.

denial of tenure.

In Beattie, the plaintiff claimed she had been fired because she opposed the reelection of the current superintendent. At various times, she was told by her school's principal that she should refrain from expressing her opinions on the matter. Shortly thereafter, the principal recommended to the superintendent that she be removed from her job. The superintendent presented the recommendation to the school board, which had previously discussed complaints regarding plaintiff's behavior with parents, teachers, and students. The board voted unanimously to remove her, and all stated in their affidavits that they had no knowledge of plaintiff's political activities or misconduct by defendants. Id. at 599-600. Beattie asserted, without further evidence, that it was her support of the opposing candidate for superintendent that lead the principal and the incumbent to recommend her removal to the school board. She lost on summary judgment nonetheless: because neither of the people involved in the recommendation

> cause[d] the adverse employment action, they cannot be liable under § 1983, no matter how unconstitutional their motives. Moreover, even if the board adopted their recommendation, that recommendation exhibited no unconstitutional motive on its face. Further, the evidence suggests that the board fired Beattie for independent reasons, and Beattie offers nothing but her own beliefs to the contrary.

Id. at 605.

Dr. Whiting's case is similar. Dr. Whiting alleges that after she spoke out against Dr. Thames's behavior, Dr. Thames retaliated by injecting scurrilous accusations of academic fraud into Dr.

24

Whiting's tenure and promotion evaluation. Unlike Ms. Beattie, however, Dr. Whiting denied in her deposition that she "at any time hear[d] any of [her] supervisors at USM tell [her she] could not speak about certain issues," and stated that she did not believe that she had been denied tenure based on any statements she had made.

The causal link alleged is twofold: first, that the "poisoned" dossier made its way through the tenure and promotion process, allegedly leaving otherwise ill-founded doubts in its wake as to Dr. Whiting's suitability. That same dossier, it should be noted, contained Dr. Whiting's various rebuttals to Dr. Thames's alleged claims, and expressed concerns over her qualifications in terms of the "service" criteria as well. Furthermore, the dossier had been evaluated by around 30 people by the time it reached President Thames, and subsets of that group had come to differing conclusions as to whether Dr. Whiting merited tenure. The record suggests, then, that the file reaching President Thames contained not just Dr. Thames's accusations, but also concerns, praise, and questions from a substantial number of other people.

Second, Dr. Whiting alleges President Thames's close relationship with his daughter, Dr. Thames, left him "biased and prejudiced" and inclined to go along with his daughter's alleged smear campaign. Dr. Whiting offers nothing but her own beliefs as foundation for this causal chain. President Thames's affidavit states that he had not discussed Dr. Whiting's tenure and promotion

25

application with his daughter or her allies, and that he based his decision not to award tenure on a careful and independent review of Dr. Whiting's dossier.

While Dr. Thames's accusations may, indeed, have been retaliatory, Dr. Thames was not responsible for the final decision to deny tenure. It could be argued that her accusations eventually influenced President Thames by their very presence in the record, but Dr. Whiting makes no argument beyond her assertions of belief that President Thames based his decision on the information inserted by his daughter, to the exclusion of all other data in the file. Nor does she offer anything beyond her own beliefs to suggest that President Thames himself carried an inherent bias against her due to his close relationship with his daughter. Accordingly Dr. Whiting has failed to meet the standard necessary for her First Amendment retaliation claim to survive summary judgment.

REMAND TO STATE COURT

As we here affirm the district court's grant of summary judgment as to Dr. Whiting's constitutional claims under 42 U.S.C. § 1983, the only remaining issues in the case are pendent questions of state law. District courts are given broad discretion to remand removed cases with pendent state law claims where retaining jurisdiction would not be appropriate. Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 357 (1988) (noting that this allows the district court to best serve the principles of "economy,

26

convenience, fairness, and comity which underlie the pendent jurisdiction doctrine."). Dr. Whiting states her concerns regarding the possible prejudice and hardship that such a transfer will place upon her. Nothing, however, suggests that the district court's decision to remand to state court constitutes so great a wrong as to constitute abuse of discretion. Accordingly, we affirm the district court's order remanding Dr. Whiting's pendent state law claims to state court.

For all the reasons stated above, the judgment of the district court is AFFIRMED.