# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-60268

United States Court of Appeals
Fifth Circuit

**FILED**
July 1, 2020

Lyle W. Cayce
Clerk

MICHAEL WIGGINTON, JR.,

      Plaintiff - Appellee

v.

CHANCELLOR DANIEL W. JONES, Individually and in his official capacity as Chancellor; PROVOST MORRIS H. STOCKS, Individually and in his official capacity as Provost; DEAN JOHN Z. KISS, Individually and in his official capacity as Dean; DEAN VELMER BURTON, Individually and in his official capacity as Dean; CHAIR ERIC LAMBERT, Individually and in his official capacity as Department Chair,

      Defendants - Appellants

Appeal from the United States District Court
for the Northern District of Mississippi

Before CLEMENT, HIGGINSON, and ENGELHARDT, Circuit Judges.
STEPHEN A. HIGGINSON, Circuit Judge:

Dr. Michael Wigginton was denied tenure during his sixth year as an assistant professor of Legal Studies at the University of Mississippi. He sued several university officials in their individual capacities, alleging that they violated his substantive due process rights when they evaluated his eligibility for tenure in an arbitrary and capricious manner. The district court denied defendants' qualified immunity defenses and allowed Wigginton's case to

No. 19-60268

proceed to a jury. After a week-long trial, Wigginton was awarded over $200,000 in damages for lost wages and past and future pain and suffering.

We hold that the district court erred when it denied defendants' motions for qualified immunity. Because Wigginton did not have a clearly-established property right, we REVERSE and RENDER judgment in favor of defendants.

## I.

In 2008, Dr. Michael Wigginton was hired by the University of Mississippi as an assistant tenure-track professor of Legal Studies in the School of Applied Sciences. Before entering academia, Wigginton spent his career as a professional law enforcement agent. He became an assistant professor after earning his PhD from the University of Southern Mississippi. At the University of Mississippi ("the University"), his research and teaching responsibilities focused on criminal justice, homeland security, and terrorism.

### A. Tenure Policies and Guidelines

As a tenure-track employee, Wigginton was required to complete a five-year probationary period before he would become eligible for a formal process of tenure review. During Wigginton's time with the University, three separate tenure documents governed the terms of his employment.[1] The University's policy, which applies to all schools within the University of Mississippi system, provides that tenure candidates will be evaluated on three different axes: "teaching, research and/or creative achievement, and service." The policy defines "research and creative achievement" as scholarly work that "make[s] contributions to the expansion of knowledge and indicate[s] the professional vitality of the candidate." It identifies several examples of achievement in this

---

[1] According to the University's "Tenure Policies and Procedures" document, the Provost or Vice Chancellor for Academic Affairs bears the responsibility of ensuring "that each school's or department's standards are consistent with the University's mission."

area, including "articles in refereed or other scholarly professional journals."[2] Textbooks are not included in the policy's list of scholarly achievements; instead, the University policy explains that a professor's contributions to textbooks are evaluated as an aspect of the professor's teaching abilities.

The School of Applied Sciences ("the School") maintains its own tenure guidelines. Like the University policy, the School's guidelines explain that "instructional textbooks" will be evaluated as an aspect of a professor's teaching abilities—not his scholarly and research skills. The School's guidelines emphasize the importance of research, warning that tenure will not be granted unless the professor establishes a "continuous record of scholarship in refereed, academic journals."

Finally, the Legal Studies Department ("the Department") maintains its own "Guidelines for Tenure and Promotion." In contrast with the above documents, the Department's guidelines explain that a candidate's publication of textbooks by a "recognized professional press" will be considered when evaluating the professor's research and scholarship contributions. The Department guidelines do not require professors to publish articles in refereed journals in order to become eligible for tenure.

All three documents contain language that highlights the subjective nature of the tenure review process. Though the University's policy notes that "[t]here is an understanding that good faith is a requirement for all facets of th[e] policy," it also explains that candidates who meet the specified criteria are not necessarily guaranteed a tenure award. The University's policy explains that candidates may be denied tenure if they are not "fitted or needed to serve the present and future needs of the University's programs." Likewise,

---

[2] A "refereed" journal is a journal that ensures rigorous review of scholarship by experts within a scholar's field before articles are selected for publication.

No. 19-60268

both the School and Department guidelines explain that a candidate's scholarship record is measured in terms of quantity and quality. The quality of a professor's research contributions will be judged by objective *and* subjective measures, including by the opinions of peer scholars in the professor's field, "ranking sources for journals, [and] citations and citation rates (when available)."

## B. Tenure Denial and Termination

The events leading to the University's decision to deny Wigginton tenure are largely undisputed. Because this appeal follows a jury verdict, we recount the facts "in the light most favorable to the jury's determination." *Waganfeald v. Gusman*, 674 F.3d 475, 480 (5th Cir. 2012).

When Wigginton was hired, Dr. David McElreath, the Chair of the Legal Studies Department during the 2008–2009 and 2009–2010 school years, told him that the "major emphasis in [the] [D]epartment was teaching." Consistent with that priority, McElreath encouraged Wigginton to focus his scholarship efforts on publishing textbooks, rather than pursuing other forms of research and writing. McElreath gave Wigginton positive evaluations in his first two annual reviews, expressing the opinion that Wigginton had "outstanding" research skills and that he was "exceed[ing] all expectations for advance in rank."

During the 2010–2011 school year, Dr. Stephen Mallory took over as interim Chair of the Legal Studies Department. Mallory told Wigginton to "keep doing what [he had been]" doing under McElreath's supervision. In Wigginton's third, fourth, and fifth year evaluations, Mallory gave Wigginton high marks for his "cutting edge" research, and explained that it was his belief that Wigginton was "making excellent progress toward meeting the expectations for tenure-track faculty." A month before Mallory submitted Wigginton's fifth-year review, Wigginton was notified that he had been

4

nominated for the Thomas A. Crowe Outstanding Faculty Award—a Department prize that recognized "meritorious faculty engagement in scholarship, teaching, and service." Though Wigginton was his Department's nominee, he was not selected as the winner of the Award.

In accordance with University policy, Wigginton formally applied for tenure in 2013, at the beginning of his sixth year at the University. At that time, he had co-authored five textbooks, published two peer-reviewed journal articles and had a third accepted for publication, and published one article in a professional, non-academic journal. Wigginton prepared his application and submitted a list of potential external reviewers with knowledge of his work. The Department Chair was responsible for selecting three reviewers from that list and, in consultation with the faculty, identifying two additional reviewers who could provide their assessment of Wigginton's work. All five of Wigginton's external reviewers provided a positive review of Wigginton's skills, research record, and eligibility for tenure.

Wigginton's application was forwarded to the tenured faculty members in his Department, who voted 5 to 2 in favor of granting tenure and 4 to 2 in favor of promoting him from assistant to associate professor.[3] The faculty recommendation was then submitted to Dr. Eric Lambert, who had assumed the position of Chair of the Legal Studies Department a few months earlier, in August 2013. In a six-page letter, Lambert recommended that the University deny Wigginton tenure and promotion. He based his recommendation primarily on his conclusion that Wigginton's "scholarly productivity and quality is very low." Though he acknowledged that Wigginton had contributed

---

[3] When Wigginton applied for tenure, he simultaneously applied for a promotion—a related but distinct University process. One of the tenured professors who voted to grant Wigginton tenure was an assistant professor, so he was unable to vote for or against Wigginton's promotion.

to several textbooks, he found Wigginton's peer-reviewed articles to be "both few and of low quality."

Lambert submitted his recommendation to the Dean's Committee, which voted 3 to 2 in favor of granting tenure and promotion. Wigginton's application and the Dean's Advisory Committee recommendation were then sent to Velmer Burton, Jr., the Dean of the School of Applied Sciences. Burton echoed much of Lambert's assessment and recommended rejecting Wigginton's application for tenure and promotion. In addition to his reservations about Wigginton's scholarship, Burton expressed "real concerns" that the five external reviewers who evaluated Wigginton's work were biased in their assessment.

Dean John Kiss, the Dean of the Graduate School, agreed with Lambert and Burton and recommended denying Wigginton tenure and promotion.

Pursuant to University policy, Wigginton's application was forwarded to the Tenure and Promotion Review Committee. The Committee expressed concern that the guidelines used to evaluate Wigginton were insufficiently clear. Nevertheless, the Committee "did not . . . find cause to consider the negative recommendations as arbitrary, capricious, or otherwise associated with improper grounds."

Wigginton's application was sent to Provost Morris Stocks, who recommended denying tenure and promotion because Wigginton's research "d[id] not rise to the level of outstanding."

Wigginton sought review of these recommendations by the Tenure and Promotion Appeals Committee, which held a hearing in April 2014. Though the Committee did not believe that university officials acted improperly by failing to consider evidence of Wigginton's record, it did find flaws with Wigginton's review process. The Committee was concerned that Wigginton had received inconsistent advice throughout his probationary period, and also expressed the opinion that Wigginton's external reviews should have been

viewed with more deference. It ultimately recommended that the University grant Wigginton an extended probation period "so that he can demonstrate his ability to meet [the University's tenure] expectations."

The Committee's assessment was forwarded to Daniel Jones, Chancellor of the University. Jones agreed with the previous administrator recommendations and declined to nominate Wigginton for tenure or promotion. Jones declined the Committee's recommendation to grant Wigginton an extended probationary period, and instead granted Wigginton a contract for a final year of employment. Wigginton's employment at the University concluded on May 10, 2015.

## C. Procedural History

Wigginton filed this lawsuit in June 2015. He asserted a variety of federal and state-law claims, including claims for age, sex, and race discrimination; retaliation; and a violation of his substantive due process rights. After a week-long trial, the jury returned a verdict in favor of Wigginton on his substantive due process claim and awarded him $218,000 in damages.[4]

The defendants filed a renewed motion for judgment as a matter of law and a motion to alter or amend the judgment. The district court denied defendants' motions in their entirety, and this appeal followed.

## II.

We review a challenge to a district court's denial of a motion for judgment as a matter of law "*de novo*, applying the same standard applied by the district court." *Montano v. Orange County*, 842 F.3d 865, 873 (5th Cir. 2016). Under Federal Rule of Civil Procedure 50, judgment as a matter of law is appropriate if "a party has been fully heard on an issue during a jury trial and the court

---

[4] Only two of Wigginton's claims were submitted to the jury: his substantive due process claim and his age discrimination claim. The jury found no liability on Wigginton's age discrimination claim. Wigginton does not challenge that finding on appeal.

finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).

Defendants argue that the district court erred when it denied their motions for qualified immunity. Defendants raised their qualified immunity defense multiple times in the district court, both before and after the jury issued its verdict.[5] *See* Fed. R. Civ. P. 50(b) (authorizing the losing party to file a renewed motion for judgment as a matter of law within 28 days of entry of judgment). They argue that they are entitled to qualified immunity because the terms of Wigginton's employment did not give rise to a clearly-established protected property interest—a necessary prerequisite for the viability of his substantive due process claim.

"Whether an asserted federal right was clearly established at a particular time . . . presents a question of law, not one of 'legal facts.'" *Elder v. Holloway*, 510 U.S. 510, 516 (1994). We review questions of law, including the district court's qualified immunity conclusion, *de novo. See id.*; *see also Tamez v. City of San Marcos*, 118 F.3d 1085, 1091 (5th Cir. 1997) ("We review *de novo* [the court's] legal conclusions, whether regarding federal or state law, in entering judgment under Rule 50(b)."). "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was *clearly established* at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (emphasis added). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The court

---

[5] Specifically, defendants moved for qualified immunity on at least five separate occasions: in their motion to dismiss; in their post-discovery motion for summary judgment; at the close of Wigginton's case-in-chief; at the close of all evidence; and after the jury verdict was announced.

must be able to point to "controlling authority—or a 'robust consensus of [cases of] persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (footnote omitted) (quoting *al-Kidd*, 563 U.S. at 742). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

In addition to their qualified immunity defenses, defendants make several additional arguments in favor of an amended judgment or new trial. We agree that Wigginton fails to establish that his rights were clearly established, and we therefore do not reach defendants' other arguments in support of reversal.

## III.

The district court erred when it denied defendants' motion for qualified immunity and concluded that Wigginton had a clearly-established property interest. In reviewing a substantive due process claim, the existence of a protected property interest is a threshold issue we must reach before we consider whether the defendants' actions were arbitrary and capricious. *See Moulton v. City of Beaumont*, 991 F.2d 227, 230 (5th Cir. 1993). "If there is no protected property interest, there is no process due." *Spuler v. Pickar*, 958 F.2d 103, 106 (5th Cir. 1992); *see also Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 344 (5th Cir. 2006), *abrogated on other grounds by Sims v. City of Madisonville*, 894 F.3d 632 (5th Cir. 2018). We regularly grant qualified immunity in substantive due process cases where the plaintiff fails to establish a clearly-established property interest. *See, e.g.*, *Wilkerson v. Univ. of N. Tex. By and Through Bd. of Regents*, 878 F.3d 147, 155 (5th Cir. 2017); *Williams v. Tex. Tech. Univ. Health Scis. Ctr.*, 6 F.3d 290, 294 (5th Cir. 1993). Because Wigginton fails to identify any state or federal law that placed defendants on

notice that his alleged contractual right to a fair tenure-review process was a constitutionally-protected interest, we reverse.

In order to have a property interest in a benefit, "a person . . . must have more than an abstract need or desire for it," and he must be able to establish "more than a unilateral expectation" that he would receive it. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). To succeed on his substantive due process claim, Wigginton must show that he had a "legitimate claim of entitlement" to the interest he asserts. *Id.* Property interests are created and defined by "existing rules or understandings that stem from an independent source such as state law." *Id.* However, whether a state-created property interest "rises to the level" of a constitutionally-protected interest is a matter of federal constitutional law. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757 (2005).[6]

By definition, the establishment of a discretionary tenure policy demonstrates that "teachers without tenure are *not* assured of continuing employment." *Staheli v. Univ. of Miss.*, 854 F.2d 121, 124 (5th Cir. 1988). Discretionary tenure policies provide universities with the flexibility to grant or deny tenure based on subjective criteria, rather than "restrict[ing] . . . administrators' discretion by objective criteria and mandatory language." *Wicks v. Miss. Valley State Univ.*, 536 So. 2d 20, 23 (Miss. 1988). Consistent with these principles, we have rejected claims by professors who argue that positive annual reviews create a *de facto* right to tenure. *See Whiting*, 451 F.3d at 345 ("[P]ositive annual reviews do not serve to generate a property interest

---

[6] In *Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985), Justice Powell suggested in a concurrence that "substantive due process rights are created *only* by the Constitution." *Id.* at 229 (Powell, J., concurring) (emphasis added). Since then, however, this circuit has held that substantive due process rights can be derived from state law, and are therefore treated in the same manner as rights that give rise to a procedural due process claim. *See Schaper v. City of Huntsville*, 813 F.2d 709, 718 (5th Cir. 1987).

in tenure."); *Staheli*, 854 F.2d at 124 (rejecting a professor's claim that the University had an "informal tenure obligation" because he met the policy's specific standards of excellence and his department chairman had "assured him that his progress [toward tenure] was satisfactory").

Though an automatic or non-discretionary tenure policy may give rise to a protected property interest, *see Honore v. Douglas*, 833 F.2d 565 (5th Cir. 1987), the University's policies and guidelines clearly indicated that Wigginton was not guaranteed tenure. The policies and guidelines explained that even professors who meet the tenure criteria may not be "automatically fitted or needed to serve the present and future needs of the University's programs." Moreover, Wigginton's tenure evaluation process was based on a qualitative assessment, and the policies and guidelines made clear that he was not guaranteed tenure simply by fulfilling a specific set of numerical criteria. *Id.* The University's tenure system thus demonstrates the "inexorable internal logic" of a tenure system: "The whole purpose of the distinction between tenured and non-tenured faculty [is] to give the University discretion over the employment of non-tenured teachers." *Staheli*, 854 F.2d at 124–25.

The district court acknowledged that Wigginton did not have a protected property interest in "continued employment,"[7] but it concluded that he presented sufficient evidence to establish a different kind of protected interest—an interest in "a fair merit-based inquiry free from irrationality as to whether he should receive tenure and promotion." We hold that the district court erred in denying defendants' motion for qualified immunity because

---

[7] It is well-established that a tenure-track employee in Mississippi does not have a property interest in continued employment. *See Whiting*, 451 F.3d at 344 ("Mississippi law is clear that neither state legislation nor state regulations create a legitimate expectation of continued employment for a non-tenured faculty member."); *Wicks*, 536 So. 2d at 23 (citing Miss. Code. Ann. § 37-101-15(f) for the principle that state law "does not create a legitimate expectation of continued employment for a non-tenured employee").

there was neither controlling authority nor a robust consensus of persuasive authority that placed Wigginton's rights beyond debate. *See Morgan*, 659 F.3d at 371–72, 382; *Pearson v. Callahan*, 555 U.S. 223, 242 (2009) (permitting courts to determine whether a right is clearly established before determining whether a constitutional violation occurred).

In *Klingler v. University of Southern Mississippi*, an unpublished decision issued in 2015, we observed that Mississippi law recognizes that an employee's "contract rights . . . constitute enforceable property interests, and 'employee manuals become part of the employment contract, creating contract rights to which employers may be held.'" 612 F. App'x 222, 227–28 (5th Cir. 2015) (footnote omitted) (first citing *Univ. of Miss. Med. Ctr. v. Hughes*, 765 So. 2d 528, 536 (Miss. 2000); then quoting *Whiting*, 451 F.3d at 345). We have also been clear, however, that not all employment contracts or manuals rise to a vested property right. Protected property interests are "not incidental to public employment," *Muncy v. City of Dallas*, 335 F.3d 394, 398 (5th Cir. 2003), and the Mississippi Court of Appeals has explicitly held that "[t]he mere existence of a faculty handbook does *not* create [a protected property interest]." *Suddith v. Univ. of S. Miss.*, 977 So. 2d 1158, 1171 (Miss. Ct. App. 2007) (emphasis added). "In determining whether statutes and regulations limit official discretion, the Supreme Court has explained that we are to look for 'explicitly mandatory language . . . .'" *Ridgely v. FEMA*, 512 F.3d 727, 735 (5th Cir. 2008) (quoting *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 463 (1989)). In other words, "[i]t matters what the handbook actually says." *Suddith*, 977 So. 2d at 1172.

Wigginton fails to cite "explicitly mandatory language" in his tenure policies that created a clearly-established property interest. *See Ridgely*, 512 F.3d at 735. To support his claim, he points to the University's "understanding that good faith is a requirement for all facets of [the tenure] policy." He also

observes that the University's policies and guidelines established specific criteria for tenure, arguing that the defendants were required to apply that criteria in a consistent manner.

We have rejected substantive due process claims brought by tenure-track employees who assert that similar contractual language or tenure procedures gave rise to a clearly-established protected property interest. In *Klingler*, for example, citing *Whiting*, 451 F.3d at 346, we rejected a tenure-track employee's claim that he had a protected property interest in "satisfy[ing] the tenure criteria" promulgated by his employer. 612 F. App'x at 228. Like Wigginton, the plaintiff in *Klingler* was employed by a university with a discretionary tenure policy, which meant that "the decision over his continued employment [was] entirely within the discretion of the board." *Id.* Because Klingler had no "legitimate expectation of *attaining* tenure," we held that "[i]t follows, *a fortiori*, that Klingler could have no legitimate expectation in an opportunity to satisfy the tenure criteria." *Id.* (first emphasis added). We have also held that a university's failure to follow its own internal rules does not always establish to a due process violation. *See Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1230 (5th Cir. 1985). And, outside of this circuit, courts have resisted the efforts of plaintiffs to "construct a property interest out of procedural timber." *Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 990–91 (10th Cir. 1996). Against this backdrop, Wigginton fails to demonstrate that the language in his contract that allegedly guaranteed him a "fair process of tenure review" gave rise to a clearly-established property right.

Wigginton cites a number of additional cases to support his claim that his constitutional rights were clearly established, but those cases are similarly unavailing. As the party defending against a claim of qualified immunity, Wigginton bears the burden of demonstrating that clearly-established law placed defendants on notice that they were violating his protected property

interest. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). The cases he relies upon do not define his asserted property right with sufficient particularity to defeat defendants' qualified immunity defense. *See Morgan*, 659 F.3d at 372.

First, though Wigginton cites *Honore v. Douglas* to support his claim that his property interest was clearly established, that case involved an automatic tenure process—not the discretionary process at issue here. 833 F.2d at 569. Likewise, in *Spuler*, we rejected the plaintiff's argument that his employment manual established a property interest in a "reasonable expectation of achieving tenure if he was qualified." 958 F.2d at 106. We held that the handbook, which gave the administrators the right to grant or deny tenure as they chose, "bestowed no contractual rights on [plaintiff] and no concomitant obligations on the University." *Id.* at 107. And though we recognized that employment contracts may create clearly-established property rights in *Klingler*, that case dismissed a claim that was similar to Wigginton's, further undermining Wigginton's argument that defendants were on notice of his constitutional rights. 612 F. App'x at 227 (holding that plaintiff had no property interest in satisfying the tenure criteria outlined in his employment handbook).

Moreover, to the extent that the district court relied upon our decision in *Harrington v. Harris* to conclude that Wigginton's property right was clearly established, there are several distinguishing circumstances in that case that set it apart from Wigginton's. In *Harrington*, a group of tenured professors argued that their employer, Texas Southern University, awarded merit-based pay increases in an arbitrary and capricious manner. 118 F.3d 359, 368 (5th Cir. 1997). We assumed without deciding that plaintiffs "had a property interest in a rational application of the university's merit pay policy." *Id.* Unlike Wigginton, however, the plaintiffs in *Harrington* already had tenure,

14

giving them a stronger claim to a clearly-established protected property interest. *See Levitt*, 759 F.2d at 1231 (holding that tenured employees have a constitutional interest in continued employment). The court in *Harrington* also reached its decision without conducting any analysis regarding the plaintiffs' property right, assuming that a property right existed because the defendants failed to contest it. 118 F.3d at 368. In light of these distinctions, we decline to find that *Harrington* defined the contours of Wigginton's constitutional rights with enough specificity to place defendants on notice. *See Morgan*, 659 F.3d at 371–72.

Wigginton cites a handful of Sixth Circuit cases involving similar claims, but those cases also fail to persuade. In *Purisch v. Tennessee Technological University*, the Sixth Circuit held that a professor "who is eligible for tenure consideration" may have "some minimal property interest in a fair tenure review process." 76 F.3d 1414, 1423 (6th Cir. 1996); *see also Webb v. Ky. State Univ.*, 468 F. App'x 515, 521 (6th Cir. 2012). But the Sixth Circuit reached that conclusion in cases involving *procedural* due process claims—not the substantive due process claim at issue here. Though property interests may be established in the same manner for both substantive and procedural due process claims, *see Schaper v. City of Huntsville*, 813 F.2d 709, 716 (5th Cir. 1987), Wigginton's claims are materially distinct from the interests identified in *Purisch* and *Webb*. He does not argue that the defendants failed to provide him with the required tenure review process—indeed, he admits that he received several rounds of appeals and hearings. In *Purisch* itself, the Sixth Circuit rejected the plaintiff's claims, concluding that he had been given sufficient process when the University afforded him the opportunity to present his tenure-related grievance orally and in writing. 76 F.3d at 1424; *see also Webb*, 468 F. App'x at 521–22 (holding that plaintiff who was provided with opportunity to appeal a tenure decision was not deprived of a property

interest). Even if these out-of-circuit cases supported Wigginton's claim, they do not constitute robust, persuasive authority sufficient to defeat a motion for qualified immunity. *Morgan*, 659 F.3d at 371; *al-Kidd*, 563 U.S. at 742.

In *Spuler*, we held that tenure-track employees face an uphill battle when challenging the denial of tenure under a discretionary tenure system. "[I]n future challenges, officials formulating tenure decisions in circumstances similar to the instant case will likely benefit from qualified immunity." 958 F.2d at 108. Because Wigginton has failed to demonstrate that clearly-established law placed defendants on notice that he had a protected property interest, we reverse the district court's denial of their qualified immunity defense.

## IV.

For the foregoing reasons, we REVERSE and RENDER judgment in favor of defendants.