**Albert C. STAHELI, Plaintiff–Appellant,**

**v.**

**The UNIVERSITY OF MISSISSIPPI, et al., Defendants–Appellees.**

**No. 87–4087.**

United States Court of Appeals, Fifth Circuit.

Sept. 9, 1988.

David G. Hill, Hill and Lewis, Oxford, Miss., for plaintiff-appellant.

Ed Davis Noble, Jr., Asst. Atty. Gen., University of Mississippi Medical Center, Jackson, Miss., Mary Ann Connell, University of Mississippi, Edwin Lloyd Pittman, Atty. Gen., Jackson, Miss., for defendants-appellees.

John H. Dunbar, Oxford, Miss., for Allie Smith.

Before GEE, DAVIS and SMITH, Circuit Judges.

GEE, Circuit Judge:

The University of Mississippi employed Dr. Albert Staheli as an associate professor of geology under a series of one-year contracts. Dr. Staheli was on "tenure track"; that is, he was hired with the mutual expectation that he would be considered for tenure after five years. When he eventually applied for tenure, however, the University did not grant it. He then brought suit against the University and certain of its employees, lost, and now appeals. We affirm.

### A. Facts and Prior Proceedings

Dr. Staheli contends that he was denied tenure in retribution for the exercise of his right to free speech. He also contends that the manner of denial violated his right to due process. The first contention went to a jury, which found for the University. The second was resolved in favor of the University on a motion for summary judgment. We set out the facts accordingly: the record facts related to free speech we summarize most favorably to the University and the jury verdict; those related to due process we summarize most favorably to Dr. Staheli, the opponent of summary judgment.

### 1. First Amendment Facts

Dr. Staheli's residence bordered a field where the University buried dead laboratory animals—but not deeply enough, he discovered, since scavenger animals were removing them. Upset by this untidy situation, Staheli wrote to the University comptroller, asking him to do something about the problem.

About the same time, two University employees—supposedly because they had forgotten the gate key to the burial field and Dr. Staheli's yard was handy—buried a dead mouse there. Dr. Staheli was hiding in a bush nearby and observed this untoward event. The employees' supervisor found out about the incident on the same day and immediately drove out to apologize. After this incident, Dr. Staheli wrote another, more pointed letter to the comptroller. This came to the attention of the Chancellor, who gave it to one of his assistants and asked him to look into and correct the problem.

Within a few weeks, the University stopped using the field to bury animal remains, arranging for other means of disposal with the State Department of Health. The Department was pleased with the University's prompt resolution; and the comptroller in turn wrote to Dr. Staheli, thanking him for reporting the problems, reporting on how they had been solved, and apologizing for any personal affront. All this took place in 1980, approximately two years before the tenure process began in earnest.

### 2. Due Process Facts

The University maintains an elaborate formal tenure policy, set out in detail and circulated among the faculty. It includes a general discussion of the areas in which a teacher must excel: teaching, research, and service. These are not further defined, but a related University policy on promotion describes research as follows:

> The benchmarks of [research] quality have been generally established: books which have been published by commercial or by University presses; articles in

refereed journals of national prestige as contrasted with those whose standards are less demanding; papers accepted for presentation before regional and national organizations where competition is keen as contrasted with state or local organizations; and awards of major research grants. However, each publication or paper should be evaluated primarily on its own merits as a product of research. The tenure policy provides that a teacher be advised when hired of the standards of performance required for achieving tenure, be advised of any changes in those standards, and be evaluated yearly on his current performance and prospects of eventually gaining tenure.

The tenure policy also outlines the decisional process, which begins with review of the tenure application by the department, a recommendation by the department chair, and recommendations by each dean up the administrative ladder to the Chancellor. The Chancellor makes the tenure decision. The applicant may "appeal" an adverse decision to the faculty senate, which then gives an opinion by means of a resolution and a vote on the candidate. The Chancellor is free to accept or reject the senate's advice.

Professor Fred Manley, the chairman of Dr. Staheli's department, had been meeting with Dr. Staheli each of the first four years of teaching to advise him of his status and his progress toward tenure. Year by year, Professor Manley assured him that he was making satisfactory progress. Instead of telling him to concentrate on publishing in scholarly journals, Professor Manley instructed him to focus his research efforts on submitting papers to and making presentations at professional meetings in order to gain exposure for the geology department. In May 1982, however, only a few months before he was to apply for tenure, Dr. Staheli was informed by Allie Smith, the Dean of the School of Engineering and new acting chairman of the geology department, that he was not progressing toward tenure because he had not published in a scholarly journal.

Undaunted, Dr. Staheli applied for tenure in the fall of 1982. His new department chair, Professor William Reynolds (who had replaced Manley, with Smith acting as department head in the interim) recommended him; but Dean Smith recommended that he not be granted tenure. Smith gave a number of reasons: lack of any publication in refereed journals, poor teaching ability, grade inflation, and Staheli's constituting a divisive influence on the faculty. As the application ascended the administrative hierarchy, each successive reviewer recommended against tenure, generally relying on Smith's initial negative recommendation. At last, the Chancellor—the only person authorized to grant or deny tenure under the University's written rules—decided against Dr. Staheli. Pursuant to University procedures, Dr. Staheli "appealed" the denial of tenure to an advisory decision of the faculty senate, which voted 30 in favor of and 6 opposed to granting it, with 2 abstentions. Unmoved, the Chancellor again denied it. The following year, Dr. Staheli was considered for tenure for the second and final time. He had made no attempt to publish in the interim, however; and he did not bother to submit a formal application. This time, the two tenured members of his department voted against tenure, ending the matter.

### 3. Proceedings in the District Court

Dr. Staheli sued the University [1] and most of the officials involved in the tenure decision on various federal and state law theories; but the only claims relevant to our purposes are that he was deprived of a property interest in his teaching job without due process of law and that he was denied tenure because of the exercise of his First Amendment right to speak out on a matter of public concern. The district court granted summary judgment on the due process claim, holding that Dr. Staheli had no protected property interest in his probationary teaching position. 621

---

**1.** There may be Eleventh Amendment problems with this suit against a state university; but the parties do not raise the issue and given our disposition of the case we need not discuss them. *Cf. Neuwirth v. Louisiana State Board of Dentistry,* 845 F.2d 553, 555 (5th Cir.1988).

F.Supp. 449. The district court ruled that certain statements and activities of Dr. Staheli involving the University's disposal of laboratory animal carcasses were protected by the First Amendment and set for trial the question of causation: was the protected activity sufficiently galling to the University officials that it became a substantial factor in the decision to refuse tenure? Dr. Staheli did not request a directed verdict on the issue of causation at the close of evidence. The jury determined, in response to an interrogatory based on *Mt. Health City Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed. 2d 471 (1977), that Dr. Staheli's protected activities were not a "substantial or motivating factor in the decision of the defendant to deny the plaintiff tenure."

Dr. Staheli appeals.

### B. The Due Process Claim

■ Dr. Staheli's due process argument is this: Although there was a written tenure policy at the University that permitted only the Chancellor to make a tenure decision, the remainder of that policy set out specific standards of excellence that he met. Moreover, in his view, the tenure policy created the practice of yearly review by the department chairman and in those meetings his department chairman assured him that his progress was satisfactory. The specific standards in the policy, which he had met, coupled with the understanding that he had with his department head, created an informal tenure obligation that over-rode the requirement that only the Chancellor could grant tenure. In consequence, the argument runs, he had an implicit, mutual understanding with the

University that his job would continue: a *de facto* tenure.[2] That *de facto* tenure was rudely interrupted when the University decided he had no *de jure* tenure. This interruption, Dr. Staheli asserts, was the deprivation of a property interest protected by the Fourteenth Amendment.

We do not agree. The institution of tenure has an inexorable internal logic: the very existence of a tenure system means that those teachers without tenure are *not* assured of continuing employment. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 568 (1972) (non-tenured college teacher had no constitutionally protected property interest in his job). Based on that internal logic, we have repeatedly denied claims by non-tenured, probationary school employees that they had a *de facto* tenure. *See, e.g., Wells v. Doland,* 711 F.2d 670, 675 (5th Cir.1983); *Montgomery v. Boshears,* 698 F.2d 739, 742 (5th Cir.1983); *Hillis v. Stephen F. Austin University,* 665 F.2d 547, 552 (5th Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1316 (1982); *Wood v. University of Southern Mississippi,* 539 F.2d 529, 531–32 (5th Cir.1976).

Of course, if a school has no formal tenure system but has set up in its place explicit or implicit conditions that, if fulfilled, give the teacher job security, the school cannot violate the very agreement that it created and discharge the teacher without constitutional process. For example, the Supreme Court held in *Perry v. Sindermann,* 408 U.S. 593, 600, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), that a teacher's claim could survive summary judgment when, although the College had

---

**2.** At times Dr. Staheli seems to contend that the point is not whether he had *de facto* tenure, but whether the Chancellor failed to make the correct tenure decision. Since he had fulfilled all that was required of him, he argues, the Chancellor *should* have granted him tenure. This amounts to an assertion that the Chancellor's decision was wrong.

We do not sit, however, as a state court reviewing the Chancellor's decision under state administrative law, but as a federal court reviewing the constitutionality of the decision. An incorrect decision by a government official may rise to the level of a violation of "substan-

tive" due process if the decision is literally irrational, but even then the claimant must show the loss of a protected liberty or property interest. *Brennan v. Stewart,* 834 F.2d 1248, 1257 (5th Cir.1988). Our task is to determine whether, prior to the Chancellor's decision and independent of its wisdom or correctness, Dr. Staheli had a property interest in his job that was protected by the Fourteenth Amendment. Without discerning such a property interest, we cannot reach the "substantive" due process issue; and in this case, Dr. Staheli has not even argued the question of "substantive" due process—at least not directly.

no official tenure policy, it was alleged to have a *de facto* one. The teacher in *Perry* pointed to telling evidence, such as a long-standing provision in the faculty guide that read:

> *Teacher Tenure:* Odessa College has no tenure system. The Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work.

*Perry,* 408 U.S. at 600, 92 S.Ct. at 2699.

But nothing like that occurred here. The University had a formal, written, widely-circulated tenure policy to which it adhered. The whole purpose of the distinction between tenured and non-tenured faculty was to give the University discretion over the employment of non-tenured teachers. Dr. Staheli is unhappy with the way that the University *exercised* its discretion, but that does not create in him a protected property interest.[3]

Nor could Professor Manley's representations and assurances that Dr. Staheli was progressing toward tenure create a constitutionally protected property interest. First, as the Fourth Circuit has correctly noted, the *school itself* must enter into the agreement which gives rise to a protected interest:

> A property right in a government benefit can arise out of an informal or implicit rule or understanding. But there can be no property right unless the government entity in question has adopted the asserted rule or entered into the asserted understanding.
>
> \*   \*   \*   \*   \*   \*
>
> Dr. Sabet has failed to show that EVMS [the school] adopted an informal policy of traditional tenure modeled after the AAUP [Association of American University Professors] guidelines. Indeed, the record almost inescapably shows the exact opposite. It is unlikely in the extreme that an institution which has a formal tenure policy stated with precision in writing in a generally circulated and available faculty handbook has also developed an altogether inconsistent informal policy.

*Sabet v. Eastern Virginia Medical Authority,* 775 F.2d 1266, 1269–70 (4th Cir. 1985) (citations omitted).

Second, even assuming that Dr. Manley spoke for the University, we have held that when formal rules and informal understandings conflict, the formal rules control. In other words, when the state provides an explicit and formal policy governing entitlement to a job, informal and customary understandings cannot create a property interest in the face of the formal rules. In a case involving employees of the Texas land office, we noted:

> The Supreme Court's holding [in *Perry v. Sindermann*] that an informal understanding may lead to a property interest must therefore be recognized as standing in the absence of an officially promulgated position, one way or the other, on the issue of a teacher's tenure. Here, we have interpreted § 31.020 as establishing a clear and official stand [of at-will employment]; having done so, we conclude that informal understandings and customs to the contrary, and subsequent, to the enactment of the statute cannot be the source of an employee's property interest. We reiterate the language of *Roth* that understandings and customs must "stem from ... state law." To say that customs entirely contrary to a statute's meaning may stem from that statute would defy reason; only if consistent with official law may such practices create a property interest in one's job.

*Batterton v. Texas General Land Office,* 783 F.2d 1220, 1223–24 (5th Cir.) (citation and footnote omitted), *cert. denied* 479 U.S. 914, 107 S.Ct. 316, 93 L.Ed.2d 389 (1986). So much for the law.

As for policy, however much we might sympathize with Dr. Staheli, a decision in his favor would have perverse consequences. Dr. Staheli's claim is based on

---

3. *See supra* note 2.

two sets of facts: 1) relatively detailed contents of the written tenure policy, coupled with an assertion that he has fulfilled its requirements; 2) the alleged understanding of continued employment that he had with his department chairman. If Dr. Staheli prevails, the University will have received powerful incentives to make its tenure policy *less* specific and therefore less helpful to associate professors seeking to discern and fulfill the requirements for tenure. Moreover, the University may well seek to insure that its department heads do not give encouragement or approval to non-tenured candidates in the yearly review sessions, lest such assurances be held to have created property rights. The result is that Dr. Staheli's small victory would be a major defeat for future probationary teachers. They would be groping in the dark through a high-pressure, intricate process with even less guidance and information than they currently have.

At worst, Dr. Staheli was misled by his department head about his chances of making tenure. Whatever actual expectations Dr. Staheli may have had, they cannot be constitutionally baptized a "legitimate claim of entitlement" to permanent employment. This is not a state-law suit claiming detrimental reliance and seeking damages based on misleading statements by Dr. Staheli's former department chairman, with the University joined under respondeat superior; such a case might be well-founded. This is a constitutional action asserting a property interest in a non-tenured teaching job; and it is not.

### C. The Jury Verdict

■ The district court held (and appellees do not dispute) that when Dr. Staheli complained about the disposition of the laboratory animal carcasses his complaint was protected by the First Amendment. The district court empaneled a jury to determine whether these events caused Dr. Staheli's tenure denial. Dr. Staheli did not move for a directed verdict after the close of evidence. The jury found that the animal carcass dispute was not a "substantial

or motivating factor in the decision of the defendant to deny the plaintiff tenure." Dr. Staheli now contends that the jury's verdict is not supported by the evidence.

His failure to object to the submission of the case to the jury, however, leaves him with an almost insuperable burden on appeal:

> Absent a motion for a directed verdict in the district court, appellate review of a sufficiency challenge is confined to a determination "whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a 'manifest miscarriage of justice.'"

*Smith v. State Farm Fire & Cas. Co.*, 695 F.2d 202, 205 (5th Cir.1983) (quoting *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 297 (5th Cir.1978), quoting in turn *American Lease Plans, Inc. v. Houghton Construction Co.*, 492 F.2d 34, 35 (5th Cir.1974), and *Little v. Bankers Life & Casualty Co.*, 426 F.2d 509, 511 (5th Cir. 1970)) (emphasis in original). Although our inquiry into the facts of a case involving free speech may be somewhat more searching than usual,[4] in a case tried to a jury the district court must be given the first opportunity to make that inquiry. Dr. Staheli did not ask the district court to examine the facts for sufficiency, and in consequence we will reverse only if there was literally no evidence to support the jury verdict.

There was, of course, *some* evidence to support the jury's verdict. Even under *Boeing Co. v. Shipman*[5] review, the case is not particularly close. The evidence of retaliatory discharge was not so overwhelming that reasonable jurors would have been compelled to find in Dr. Staheli's favor. Given that, it follows necessarily that the jury verdict was not a "manifest miscarriage of justice." We cannot disturb the jury's verdict.

### D. The Evidentiary Ruling

■ Dr. Staheli wanted to testify about a statement made to him by Dr. Cabel

---

4. *See e.g., Gonzalez v. Benavides,* 774 F.2d 1295, 1300 (5th Cir.1985), *cert. denied,* 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986).

5. 411 F.2d 365 (5th Cir.1969) (en banc).

Schull. Dr. Schull was an accounting professor involved in University administration: a member of the faculty senate and of the Planning Council. The Planning Council "controls the budget and makes general management and planning decisions for the course of the University's activities." Appellant's brief at 28. Dr. Schull purportedly told Dr. Staheli that the Chancellor was upset about the animal carcasses ·incident, that the Chancellor was vindictive and would hold a grudge, and that Dr. Staheli "would not get his." *Id.*

Dr. Staheli sought to introduce Schull's statement as a non-hearsay admission of a party-opponent under Fed.R.Evid. 801(d)(2)(D). The district court refused to admit the evidence. Dr. Staheli now complains that this refusal was reversible error.

There are only a handful of cases on Rule 801(d)(2)(D) [6] in our circuit, and none addressing the problem of which agents can speak for the principal in a way that constitutes an admission. The Comments to the Rule assert that the traditional approach to this problem was too narrow:

> Was the admission made by the agent acting in the scope of his employment? Since few principals employ agents for the purpose of making damaging statements, the usual result was exclusion of the statement. Dissatisfaction with this loss of valuable and helpful evidence has been increasing.

Notes of Advisory Committee, Comment (d)(2)(D). The Rule adopts the somewhat broader notion of a statement *"concerning a matter"* within the scope of the agency relationship."

Here, Dr. Schull had nothing to do with Dr. Staheli's tenure decision—or with any personnel matter concerning Dr. Staheli. Therefore, his statement did not concern a matter within the scope of his agency and was made in his capacity as wiseacre only.

---

6. Rule 801 reads in pertinent part:
   (d) Statements which are not hearsay. A statement is not hearsay if—

   \*   \*   \*   \*   \*   \*

This result is consonant with the results reached by other circuits in similar cases. *See e.g., Hill v. Speigel, Inc.,* 708 F.2d 233, 237 (6th Cir.1983) (age discrimination suit by former district manager; statements by other district managers that plaintiff had been discharged because of his age held inadmissible; "The mere fact that each of these men was a manager ... is clearly insufficient to establish that matters bearing upon Hill's discharge were within the scope of their employment."). The district court did not err in refusing to admit the evidence.

## E. Conclusion

Dr. Staheli did not have a protected property interest in his job at the University of Mississippi. The University had a formal tenure policy, and Dr. Staheli did not present any evidence to suggest that it also had an informal tenure policy. There was some evidence to support the jury's finding that Dr. Staheli's exercise of First Amendment rights was not a substantial or motivating factor in the University's refusal to grant him tenure. The judgment of the district court must be AFFIRMED.

---

(2) Admission by a party-opponent. The statement is offered against a party and is ... (D) a statement by the party's agent or servant concerning a matter within the scope of the agency relationship....