# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

─────────

No. 16-41716

─────────

DALE A. WILKERSON,

        Plaintiff - Appellee

v.

UNIVERSITY OF NORTH TEXAS, By and Through Its Board of Regents; NEAL SMATRESK, President; FINLEY GRAVES, Interim Provost and Vice President for Academic Affairs; WARREN BURGGREN, Former Provost and Vice President for Academic Affairs; ARTHUR GOVEN, Former Dean, College of Arts and Sciences; PATRICIA GLAZEBROOK, Former Chair, Department of Philosophy and Religion Studies,

        Defendants - Appellants

─────────────────

Appeal from the United States District Court
for the Eastern District of Texas

─────────────────

Before SMITH, BARKSDALE, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

A Texas university declined to renew a lecturer's contract. After several extensive but unsuccessful administrative appeals, that lecturer sued the school and its administrators, alleging a deprivation of his property interest in his job without due process and tortious interference with his employment contract. The district court denied summary judgment to the administrators on their immunity defenses. We reverse.

United States Court of Appeals
Fifth Circuit

**FILED**

December 20, 2017

Lyle W. Cayce
Clerk

No. 16-41716

**I.**

The University of North Texas is a state institution with a formal tenure track. Plaintiff-appellee Dale Wilkerson was never on that track. He was instead an untenured lecturer in the University's Department of Philosophy and Religion Studies from 2003 to 2014. For the first eight years, he and the University entered separate, one-year teaching contracts. In 2011, Wilkerson became the Philosophy Department's "Principal Lecturer."

Wilkerson's "Principal Lecturer" contract provided a "temporary, non-tenurable, one-year appointment with a five-year commitment to renew at the option of the University." As he was signing that contract, Wilkerson avers, the department chair (defendant-appellant Patricia Glazebrook) explained that the optional-renewal provision was "a convenience" in place only "in the event a reduction in workforce were necessary" or "in the event of a major policy violation." But the written agreement included this integration clause: "No previous written or oral commitment will be binding on the University except as specified in this letter" and its attachments.

With his post came a "nine-month base salary." And as the contract explained, "selected [U]niversity policies, procedures and expectations" governed Wilkerson's appointment. Among those policies were the departmental bylaws, which advised Wilkerson that Principal Lecturer contracts "are renewed annually." Along those same lines, the bylaws added that "[l]ecturers may hold full- or part-time appointments of one or multiple years that are renewed pending the departmental annual review process and resource availability," and that even "[m]ulti-year lecturers are in a temporary, non-tenurable one-year contract with a three to five year commitment to renew at the option of [the University]." The University's constitution echoed that point: "Renewal of term appointments . . . is entirely at the option of the [U]niversity." This "commitment to renew" at the school's "option" meant the University could reappoint

2

No. 16-41716

Wilkerson without a formal search process requiring him to compete with other candidates. Even so, the bylaws maintained, "[r]eappointment . . . offer letters w[ould] be initiated on an annual basis" and "there shall be no expectation of continued employment beyond the end of the current appointment period."

Twice the University renewed Wilkerson's contract. It was during his first renewed term—in March 2013—that Wilkerson attended a student-recruitment party hosted by the department's then-Director of Graduate Studies. There, Wilkerson met C.B., a 26-year-old, incoming graduate student.[1] The two had a brief relationship. Several times in June 2013 they met at Wilkerson's house. Twice they kissed. A few weeks later, C.B. joined Wilkerson and another female grad student on an overnight trip from Dallas to Memphis. As the complaint tells it, the three shared a hotel room and a platonic evening.

By September 2013, Wilkerson had become his department's Director of Graduate Studies[2] and C.B. had matriculated. A few months passed before C.B. filed a formal complaint with the University, contending that Wilkerson sexually harassed her the past summer. Those allegations complicated Wilkerson's renewal process. When prodded why the school had not yet renewed Wilkerson's contract, Glazebrook told him that his renewal hinged on an internal investigation. That inquiry, headed by the University's Office of Equal Opportunity (OEO), found no violation of the University's consensual relationship policy and insufficient evidence of sexual harassment.

Glazebrook then checked with the University's general counsel and the dean about renewing Wilkerson's contract. Though school policies gave Glazebrook an integral role in deciding whether to hire and retain faculty, they

---

[1] Because this student eventually filed sexual harassment claims against Wilkerson, the parties use her initials to protect her identity.

[2] The litigants dispute whether Wilkerson had informally accepted the Director position before or after he kissed C.B. The answer is immaterial to our dispositive immunity questions.

No. 16-41716

also contemplated that Glazebrook would consult her department's "Personnel Affairs Committee" before recommending Wilkerson's non-renewal. She did not do so. Rather, on July 3, 2014, she sent Wilkerson a letter (on University letterhead) informing him that his appointment would not be renewed. The letter reminded Wilkerson that his position was "renewable annually at the option of the University" and instructed him how to appeal.

Wilkerson appealed to the College of Arts and Sciences Ad Hoc Grievance Committee. That body permitted Wilkerson, with counsel by his side, to present, object to, and confront witnesses and evidence during a hearing. At this hearing, Glazebrook defended her decision by citing Wilkerson's "poor judgment." The Committee was unpersuaded. It recommended that the college dean "reverse the non-renewal decision," concluding that "the procedural By-Laws of the Department were violated and . . . Glazebrook provided insufficient evidence to justify the non-renewal."

Next was the dean's review. Defendant-appellant Arthur Goven studied the Ad Hoc Grievance Committee report, the OEO report, and Glazebrook's recommendation. He also spoke separately with Wilkerson and then Glazebrook. Glazebrook apparently told the dean that Wilkerson had accepted the job as Director of Graduate Studies *before* meeting C.B. (This supposedly ex parte communication is one of Wilkerson's core objections to his non-renewal process.) Goven ultimately disagreed with the Committee. By his lights, any procedural mishaps did not "offset" Wilkerson's "poor professional judgment," because Wilkerson's "amorous overtures toward a young woman [he] knew or should have known would be a graduate student . . . placed the [U]niversity in a compromising situation."

Wilkerson appealed again, this time to the interim Provost and Vice President for Academic Affairs—defendant-appellant Warren Burggren. Burg-

gren charged another committee with investigating further. This second committee interviewed Wilkerson, C.B., Glazebrook, Goven, and several other faculty members. It then issued a report, opining that Glazebrook "did not follow due process" because she disregarded the bylaws requiring the Personnel Affairs Committee to appraise her decision. "Nonetheless," the report observed, "Wilkerson did indeed exercise poor professional judgment in his interactions with [C.B.]." It also found Wilkerson's chief objection—that Dean Goven relied on ex parte statements regarding when Wilkerson accepted the position of Director of Graduate Studies—"irrelevant to the final outcome." As this committee saw it, "[t]he charge of poor judgment would remain whether or not Wilkerson was [Director] because his involvement with [C.B.] was not appropriate given her position as an incoming graduate student and employee in the [Philosophy] Department." Despite nodding toward a "final outcome," however, the report balked; it offered no view on whether to reappoint Wilkerson.

By the time this report issued, Finley Graves had already replaced Burggren as Provost. Graves reviewed the relevant records—including those Wilkerson gave him—and upheld Glazebrook's decision. Wilkerson got word on March 17, 2015, and commenced this lawsuit.

Wilkerson alleges, among other things, (1) a claim under 42 U.S.C. § 1983 for deprivation of his property interest in his job without due process of law, and (2) tortious interference with his employment contract.[3] He purports to sue the University administrators in their personal capacities and seeks compensatory and exemplary damages.[4] The district court denied the administrators summary judgment on both the merits and immunity grounds for the

---

[3] The district court denied summary judgment on a Title IX claim Wilkerson alleged, but stayed further proceedings pending this interlocutory appeal.

[4] Wilkerson also seeks specific performance on his contract against the University. That remedy is not at issue on appeal.

No. 16-41716

§ 1983 due-process claim against Burggren, Glazebrook, and Goven; and the tortious interference claim against Glazebrook. *See Wilkerson v. Univ. of N. Tex.*, No. 4:15-CV-00540, 2016 WL 7242766 (E.D. Tex. Dec. 14, 2016).

This interlocutory appeal broaches only the immunity issues—whether qualified immunity lies against the § 1983 claim, and whether § 101.106(f) of the Texas Tort Claims Act[5] affords governmental immunity against the interference claim. The district court said no on both questions. We respectfully disagree.

## II.

Typically, a party cannot immediately appeal the denial of summary judgment. *Brown v. Strain*, 663 F.3d 245, 248 (5th Cir. 2011); *cf.* 28 U.S.C. § 1291. But when that denial is "of a motion for summary judgment based on qualified immunity," the ruling "is immediately appealable under the collateral order doctrine to the extent that it turns on an issue of law." *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc) (quotation marks omitted). So, too, for the denial of immunity under § 101.106(f) of the Texas Tort Claims Act. *See Cantu v. Rocha*, 77 F.3d 795, 803–04 (5th Cir. 1996) (noting that the denial of state-law immunity is immediately appealable if the doctrine "provides a true immunity from suit and not a simple defense to liability" (quotation marks omitted)); *McFadden v. Olesky*, 517 S.W.3d 287, 294–95, 298 (Tex. App.—Austin 2017, pet. denied) (holding that § 101.106(f) renders officers "immune from suit" and "completely bar[s]" certain tort claims (collecting cases)). We may hear this interlocutory appeal because it presents no material disputes over what happened or what the relevant documents say—just disagreements over their legal import.

In this posture, "[i]f the district court found that genuine factual disputes

---

[5] Tex. Civ. Prac. & Rem. Code § 101.106(f).

exist, we must accept the plaintiff's version of the facts as true to the extent supported by the summary judgment record." *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 576 (5th Cir. 2009). We therefore "review the complaint and record to determine whether, assuming that all of [plaintiff]'s factual assertions are true, those facts are materially sufficient to establish that defendants" are not immune. *Wagner v. Bay City, Tex.*, 227 F.3d 316, 320 (5th Cir. 2000); *see also Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) ("[O]nce a state official . . . asserts the [qualified immunity] defense, the burden shifts to the plaintiff to show that the defense is not available."). Still, we may examine de novo whether any factual disputes are material. *Kovacic v. Villarreal*, 628 F.3d 209, 211 n.1 (5th Cir. 2010).

### III.

The district court erred in denying the administrators qualified immunity against the § 1983 claim because Wilkerson did not have a clearly established property right.

Wilkerson's due-process theory requires him to identify a protected life, liberty, or property interest and prove that "governmental action resulted in a deprivation of that interest." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quotation marks omitted). Though he asserts a federal claim, it is state law that defines his constitutional stake—Wilkerson enjoys a property interest in his lectureship if he has "'a legitimate claim of entitlement' created and defined 'by existing rules or understandings that stem from an independent source such as *state law*.'" *Id.* (emphasis added) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

In turn, the doctrine of qualified immunity guards officials from civil liability "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S.

No. 16-41716

223, 231 (2009)); *see also DePree v. Saunders*, 588 F.3d 282, 287–90 (5th Cir. 2009) (extending qualified immunity to university administrators for disciplinary decisions). A plaintiff pierces this shield by showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We may resolve either prong first. *Id.*

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Lincoln v. Barnes*, 855 F.3d 297, 301 (5th Cir. 2017) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). That is, either "controlling authority" or "a robust consensus of persuasive authority" must "define[] the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (quotation marks omitted). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (quotation marks omitted).

Wilkerson asserts a constitutionally protected property interest in his continued employment for five years. The district court agreed, reasoning that Wilkerson had a five-year appointment and thus a "reasonable expectation of continued employment in his fourth year of a five-year commitment." *Wilkerson*, 2016 WL 7242766, at *10.

But this purported right was dubious at best.[6] Section 51.943(g) of the

---

[6] The administrators argue that this is an easy case because Wilkerson was an "at-will" employee whom the University could have terminated at any time for any reason. *Cf. Montgomery Cty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998) (discussing at-will employment). We disagree. Wilkerson's employment contract gave him a 9-month base salary and a "one-year appointment." And Texas courts observe that "[a] hiring based on an agreement of an annual salary limits in *a meaningful and special way* the employer's prerogative

No. 16-41716

Texas Education Code, which governs how public universities renew faculty contracts, limits a non-tenured teacher's rights to his or her contract. *See* Tex. Educ. Code. § 51.943(g) ("Nothing in this section shall be deemed to provide a faculty member who does not hold tenure additional rights, privileges, or remedies or to provide an expectation of continued employment beyond the period of a faculty member's current contract.").

Wilkerson's contract is similarly unavailing. It gave him a "temporary, non-tenurable, one-year appointment." True, it also contemplated "a five-year commitment to renew," but "at the option of the University." Neither the contract nor the policies it incorporated *required* the University to exercise that option. And though the University twice re-upped Wilkerson's contract, "[s]uccessive renewals of a teacher's contract . . . do[] not constitute evidence of [d]e facto tenure policy" or "any implied agreement on the part of the school . . . that a teacher has a contractual right of renewal so long as the work performed is satisfactory." *Hix v. Tuloso-Midway Indep. Sch. Dist.*, 489 S.W.2d 706, 710 (Tex. Civ. App.—Corpus Christi 1972, writ ref'd n.r.e.). Against this backdrop, a reasonable administrator could have concluded that Wilkerson had no legitimate claim of employment beyond his current one-year appointment. The administrators did not violate clearly established law.

Wilkerson urges an opposite conclusion for two unpersuasive reasons. The first is that any reasonable official would have known that Wilkerson had a legitimate claim to his job for *five years*—i.e., the length of the school's commitment to renew at its option. *Cf. Wilkerson*, 2016 WL 7242766, at *10. But

---

to discharge the employee during the dictated period of employment." *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 577 (Tex. App.—Houston [1st Dist.] 1992, no writ) (citing *Winograd v. Willis*, 789 S.W.2d 307, 310 (Tex. App.—Houston [14th Dist.] 1990, writ denied)). But even with a one-year appointment, Wilkerson still lacked a clearly established property interest in subsequent contract renewals.

that view blurs the University's *option to renew* with Wilkerson's *appointment*.[7]

Second, Wilkerson posits that the Supreme Court's decision in *Perry v. Sindermann* settled the debate over his rights. *See* 408 U.S. 593 (1972). To be sure, the district court relied on *Sindermann* to hold that Wilkerson had a clearly established right to "continued employment in his fourth year of a five-year commitment" because the University "created a series of rules and understandings" based on "representations made by Glazebrook, coupled with [the University]'s history of renewals of [Wilkerson] and other lecturers." *Wilkerson*, 2016 WL 7242766, at \*10. But *Sindermann* does not answer the constitutional question posed here: whether Texas law recognizes a multi-year property interest in a job when the controlling contract provides an untenured, one-year appointment and the applicable bylaws disavow any expectation of continued employment beyond the current appointment period. *See Mullenix*, 136 S. Ct. at 308 (the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition" (citations and quotation marks omitted)); *Morgan*, 659 F.3d at 372 (precedent must define the asserted right's contours "with a high degree of particularity").

*Sindermann*'s bearing here is uncertain. That case involved a teacher at a Texas junior college who sued the school after the administration decided

---

[7] Of course, some of the bylaws are hard enough to decipher that Wilkerson's points could carry some purchase. Take these paradoxes: "appointment contracts," the bylaws instruct, "may be for . . . *five years* [but] are renewed *annually*"; and even "[m]*ulti-year* lecturers" are on "*one-year* contract[s]." The problem for Wilkerson is that the bylaws do not alter his contract's plain meaning. Although the bylaws note that *some* appointments *may* be for *five* years, Wilkerson's contract says *his* was for *one*. More important, the issue here is qualified immunity; to aid Wilkerson, the bylaws must illuminate, not obfuscate. Nor would parol evidence help, because extrinsic evidence cannot "give the contract a meaning different from that which its language imports" or "be used to show that the parties probably meant, or could have meant, something other than what their agreement stated." *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017) (quoting *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011)).

against renewing his one-year contract. *Sindermann*, 408 U.S. at 595. The teacher averred that the college deprived him of a property interest in continued employment without due process. *Id.* at 595, 599. There, and unlike here, the junior college lacked a formal tenure system. *Id.* at 596, 600. And there, unlike here, the junior college circulated a "Faculty Guide" that stated, "The Administration of the College wishes the faculty member *to feel that he has permanent tenure* as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work." *Id.* at 600 (emphasis added). The teacher therefore aimed to prove that "his long period of service at this particular State College had no less a 'property' interest in continued employment than a formally tenured teacher at other colleges." *Id.* at 601.

Even those remarkable facts earned the teacher a minimal endorsement. The Supreme Court observed that "[a] teacher . . . who has held his position for a number of years, *might* be able to show from the circumstances of this service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure." *Id.* at 602 (emphasis added). The Court thus held that the teacher's claim survived summary judgment because he "alleged the existence of rules and understandings, promulgated and fostered by state officials, that may justify his legitimate claim of entitlement to continued employment absent 'sufficient cause.'" *Id.* at 602–03. Yet, in reaching this conclusion, *Sindermann* noted that Texas law could still bar the teacher's due process claim. *Id.* at 602 n.7 ("We do not now hold that the respondent has any such legitimate claim of entitlement to job tenure. . . . If it is the law of Texas that a teacher in the respondent's position has no contractual or other claim to job tenure, the respondent's claim would be defeated.").

That is what Texas law seems to do here. Far from inviting Wilkerson "to feel that he has permanent tenure," *id.* at 600, his contract provided a one-

year appointment, and the bylaws and caselaw warned not to expect further ones, *see Hix*, 489 S.W.2d at 710 (interpreting Texas law six months after *Sindermann* issued). *Sindermann*, then, does not fit here.

But even if *Sindermann* could be extended broadly, our precedent has not taken that approach. We have stressed that "[t]he Supreme Court's holding [in *Sindermann*] that an informal understanding may lead to a property interest *must* . . . be recognized as standing in the absence of an officially promulgated position, one way or the other, on the issue of a teacher's tenure." *Batterton v. Tex. Gen. Land Office*, 783 F.2d 1220, 1223 (5th Cir. 1986) (emphasis added) (interpreting Texas law). "[I]nformal understandings and customs," then, "cannot be the source of an employee's property interest" if the informal position conflicts with an official one. *Id.*[8] But by seizing on Glazebrook's oral representations and the University's "history of renewals of [Wilkerson] and other lecturers," *Wilkerson*, 2016 WL 7242766, at \*10, the district court overlooked the contract's integration clause[9] and put "informal understandings and customs" above the University's "officially promulgated position," *Batterton*,

---

[8] In cases where, like here, a university established a formal tenure process, we have held that the "formal tenure process generally precludes a reasonable expectation of continued employment for non-tenured faculty." *Spuler v. Pickar*, 958 F.2d 103, 107 (5th Cir. 1992) (quotation marks omitted) (interpreting Texas law); *see also Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 346 (5th Cir. 2006) ("[W]here a tenure policy exists, non-tenured university employees under Mississippi law do not have a property interest in their continued employment that warrants protection under the due process clause."); *Staheli v. Univ. of Miss.*, 854 F.2d 121, 124 (5th Cir. 1988) ("The institution of tenure has an inexorable internal logic: the very existence of a tenure system means that those teachers without tenure are *not* assured of continuing employment.").

[9] *See, e.g.*, *First Bank*, 519 S.W.3d at 109–10 ("When parties have a valid, integrated written agreement, the parol-evidence rule precludes enforcement of prior or contemporaneous agreements. As a result, extrinsic evidence cannot alter the meaning of an unambiguous contract. Courts may consider the context in which an agreement is made when determining whether the contract is ambiguous, but the parties may not rely on extrinsic evidence to create an ambiguity or to give the contract a meaning different from that which its language imports." (citations and quotation marks omitted)).

No. 16-41716

783 F.2d at 1223; *see also Hix*, 489 S.W.2d at 710. Clearly established law probably foreclosed, not welcomed, Wilkerson's due process claim.[10]

We therefore reverse and render qualified immunity to the administrators on the § 1983 claim. *Accord King v. Handorf*, 821 F.3d 650, 655 (5th Cir. 2016).

## IV.

State law compels a similar result on the tortious interference claim. Though Wilkerson alleges she acted in her personal capacity, Glazebrook gets governmental immunity.[11] *See* Tex. Civ. Prac. & Rem. Code § 101.106(f).

Tortious interference comprises four elements: "(1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred." *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

This claim, however, falls within the scope of the Texas Tort Claims Act. *See Anderson v. Bessman*, 365 S.W.3d 119, 123–26 (Tex. App.—Houston [1st

---

[10] The district court also denied the administrators summary judgment on the merits, finding triable questions whether the *plaintiff* reasonably believed he had a five-year employment interest. *See Wilkerson*, 2016 WL 7242766, at *4–6. In focusing on Wilkerson's reasonable belief, the court parsed *Sindermann* and distinguished five cases, including *Spuler*, *Staheli*, and *Whiting*, on their facts. *See id.* That approach, though appropriate on the merits issues, undermines the qualified immunity analysis—which requires asking a different question about a different party. *See, e.g.*, *Morgan*, 659 F.3d at 371 ("[W]e must ask whether the law so clearly and unambiguously prohibited [the officer's] conduct that *every* reasonable *official* would understand that what he is doing violates the law." (second emphasis added) (brackets and quotation marks omitted)).

[11] Although Glazebrook raised the Texas Tort Claims Act in her motions to dismiss and for summary judgment, the district court did not address that defense. The issue is nonetheless ripe because the trial court resolved the defense's key element—whether the defendant acted within the scope of employment—in the related context of common law "official immunity." *Compare Wilkerson*, 2016 WL 7242766*, at *10 ("[T]he Court finds that Glazebrook was not acting within the scope of her authority."), *with* Tex. Civ. Prac. & Rem. Code § 101.106(f) (granting governmental immunity to state officials who act "within the general scope of [their] employment").

No. 16-41716

Dist.] 2011, no pet.). Section 101.106(f) of the Act affords state employees governmental immunity. *See Franka v. Velasquez*, 332 S.W.3d 367, 369 (Tex. 2011); *see also Newman v. Obersteller*, 960 S.W.2d 621, 623 (Tex. 1997). The statute provides,

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

Tex. Civ. Prac. & Rem. Code § 101.106(f). When it applies, § 101.106(f) "mandates[] plaintiffs to pursue lawsuits against governmental units rather than their employees," *Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 352 (Tex. 2013), and entitles the employee "to dismissal" of the relevant tort claim, *Laverie v. Wetherbe*, 517 S.W.3d 748, 752 (Tex. 2017); *see also Anderson*, 365 S.W.3d at 126 (dismissing on § 101.106(f) grounds faculty members' tortious interference claims against university administrators).

Glazebrook meets both elements of governmental immunity: (1) her conduct was "within the general scope of [her] employment" with a governmental unit,[12] and (2) Wilkerson's tortious interference claim "could have been brought" against the University. Tex. Civ. Prac. & Rem. Code § 101.106(f).[13]

---

[12] Wilkerson concedes that Glazebrook was a University employee. And no doubt the University is a "governmental unit." *See Univ. of N. Tex. v. Harvey*, 124 S.W.3d 216, 222 (Tex. App.—Fort Worth 2003, pet. denied); *see also* Tex. Civ. Prac. & Rem. Code § 101.001(3)(D); Tex. Educ. Code §§ 61.003(3), (4).

[13] Glazebrook also argues that she prevails because (1) Wilkerson had only a one-year contract and thus a non-renewal does not interfere with his then-existing contractual interest, and (2) an agent generally cannot interfere with her principal's contracts. Though Glazebrook couches these arguments as addressing "immunity," they actually embrace the merits—whether Wilkerson can prove she interfered with his contract. That is a question we

No. 16-41716

**A.**

First we consider whether Glazebrook acted within the "general scope" of her employment when she allegedly interfered with Wilkerson's contract. We conclude that she did act within that scope.

By contrast, the district court held, and Wilkerson maintains, that Glazebrook exceeded her scope because she lacked "any general authority to terminate [Wilkerson] without an initial recommendation by the [Personnel Affairs Committee]." *Wilkerson*, 2016 WL 7242766, at *10. That is too narrow a view. After all, the Act defines "[s]cope of employment" as "the performance for a governmental unit of the duties of an employee's office or employment," which "includes being *in or about* the performance of a task lawfully assigned to an employee by competent authority." Tex. Civ. Prac. & Rem. Code § 101.001(5) (emphasis added).

Texas caselaw further cautions against a narrow view. "The employee's acts must be of the same *general nature* as the conduct authorized or incidental to the conduct authorized to be within the scope of employment." *Laverie*, 517 S.W.3d at 753 (emphasis added) (quoting *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007)). We must ask, "Is there a connection between the employee's job duties and the alleged tortious conduct?" *Id.* The answer, the Texas courts advise, "may be yes even if the employee performs negligently or is motivated by ulterior motives or personal animus." *Id.* (collecting cases).

Glazebrook acted within the general scope because a "connection" exists between her job duties and alleged misconduct. *See id.* No one disputes that

---

cannot answer on this interlocutory appeal. *See BancPass, Inc. v. Highway Toll Admin., L.L.C.*, 863 F.3d 391, 397 (5th Cir. 2017).

15

the University requires its department chairs to play pivotal roles in reappointing faculty. The University's constitution provides that department chairs shall make their own recommendations whether to retain faculty—recommendations the dean must review. Nor is there doubt that Wilkerson's non-renewal letter looks official. Glazebrook penned it on University letterhead, addressed it to a University employee, and signed it as the Philosophy Department "Chair." And it is not just the letter's form—it is all business in substance, too. Those undisputed facts show that Glazebrook's conduct was "of the same general nature as the conduct authorized or incidental to the conduct authorized" by the University. *Id.* (quotation marks omitted). We fail to see how a department chair could, as Wilkerson alleges, effectively discharge a University employee—and thus trigger a formal appeals process—while acting ultra vires and in a personal capacity.

This case therefore differs from those where Texas courts found that government employees acted outside the scope of employment. In those matters, the alleged misconduct had nothing to do with the employees' duties. *See, e.g.*, *Kelemen v. Elliott*, 260 S.W.3d 518, 524 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (on-duty police officer acted outside scope of employment when he kissed a fellow officer without consent); *Terrell ex rel. Estate of Terrell v. Sisk*, 111 S.W.3d 274, 278 (Tex. App.—Texarkana 2003, no pet.) (county judge's secretary acted outside scope of employment when she caused a fatal accident while driving in her private car to a personal doctor's appointment).

Nor does it matter that Glazebrook neglected some procedures before sending the non-renewal letter. Consider *City of Lancaster v. Chambers*, where the Texas Supreme Court held that on-duty police officers acted within the scope of their duties during a high-speed chase—even though the officers disregarded the safety of others and severely injured an innocent motorcyclist.

16

No. 16-41716

883 S.W.2d 650, 652, 658 (Tex. 1994).[14] The high bench criticized the lower court for fixating on whether the officers had "authority to drive without due regard for the safety of others." *Id.* at 658. Such a granular focus, the Texas Supreme Court observed, "misconceives the scope of authority element." *Id.* The issue is not whether the government employee had authority to commit the allegedly tortious act, but whether she was "discharging the duties generally assigned to her." *Id.*

The Texas Court of Appeals took a similar tack in *Koerselman v. Rhynard*, 875 S.W.2d 347 (Tex. App.—Corpus Christi 1994, no writ). In that case, a professor who failed to gain tenure sued his department chair for tortious interference after the chair ignored university procedures. *Id.* at 349. To be sure, that department chair erred; he was supposed to put pertinent evaluations in the plaintiff's tenure file but "instead allowed the candidates to create their own tenure files." *Id.* at 350. That blunder prevented a committee from seeing all salient opinions before denying the plaintiff tenure. *Id.* But the court still granted the chair immunity, reasoning that "[e]ven though [the chair's] act may have been wrong, it was done in connection with his official duty as the department chair to oversee the tenure election process; therefore, [he] was

---

[14] *City of Lancaster* involved Texas's "official immunity" defense. *See* 883 S.W.2d at 653. (Glazebrook also raised that defense, but it is unnecessary to resolving this appeal.) This common law doctrine affords government employees "immunity from suit from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *Id.* The "scope of . . . authority" under official immunity is nearly identical with "scope of employment" under the Texas Tort Claims Act. *Compare id.* at 658 ("An official acts within the scope of her authority [for official immunity purposes] if she is discharging the duties generally assigned to her."), *with* Tex. Civ. Prac. & Rem. Code § 101.001(5) (defining "[s]cope of employment" as "the performance for a governmental unit of the duties of an employee's office or employment," which "includes being in or about the performance of a task lawfully assigned to an employee by competent authority"). *See also Laverie*, 517 S.W.3d at 752–53 (relying on *City of Lancaster* to define § 101.106(f)'s "scope of employment" element).

17

acting within the scope of his employment." *Id.* In the court's view, "that a specific act that forms the basis of the suit may have been wrongly or negligently performed does not take it outside of the scope of authority." *Id.*

Though Glazebrook's argument is not as air-tight as the *Koerselman* defendant's was—unlike that defendant, Glazebrook leapfrogged a department committee and instead consulted the dean and general counsel—*Koerselman*'s logic still obtains. Glazebrook's job required keeping tabs on lecturer-appointments and making recommendations for future employment. Thus, even if Glazebrook acted "wrongly" by skipping appropriate procedures, her actions were "in connection with [her] official duty as department chair to oversee the [lecturer appointment] process[.]" *Id.*; *see also Anderson*, 365 S.W.3d at 124 ("[Section 101.106(f)] strongly favors dismissal of governmental employees.").[15]

Glazebrook acted within the general scope of her employment.

## B.

The next question is whether Wilkerson's tortious interference claim "could have been brought" against the University. Tex. Civ. Prac. & Rem. Code § 101.106(f). The answer is yes. *See, e.g.*, *Franka*, 332 S.W.3d at 369 ("[A]ll common-law tort theories alleged against a governmental unit are assumed to be 'under the Tort Claims Act' for purposes of section 101.106." (alterations and quotation marks omitted)).[16]

We recognize that at first blush it seems nonsensical to assert that

---

[15] Wilkerson also insists that Glazebrook cannot get governmental immunity because she acted "for her own motivations." This argument founders because "[g]overnment employees are not required to prove their subjective intent behind an allegedly tortious act in order to be dismissed from a suit pursuant to [§ 101.106(f)]." *Laverie*, 517 S.W.3d at 756.

[16] In determining whether a claim "could have been brought under [the Texas Tort Claims Act] against the governmental unit," § 101.106(f), it does not matter that the University would be immune from suit, *see Tex. Dep't of Aging & Disability Servs. v. Cannon*, 453 S.W.3d 411, 415 (Tex. 2015); *Franka*, 332 S.W.3d at 379.

No. 16-41716

Wilkerson could have brought his tortious interference claim against the University. To win, Wilkerson would have to prove that his employer interfered with his employment contract—a legal impossibility, as "one cannot tortiously interfere with one's own contract." *Hussong v. Schwan's Sales Enters., Inc.*, 896 S.W.2d 320, 326 (Tex. App.—Houston [1st Dist.] 1995, no writ). But Texas caselaw has resolved this difficulty. Take, for instance, *Anderson v. Bessman*. There, some fired faculty members sued their university's administrators for tortious interference with the plaintiffs' employment contracts. 365 S.W.3d at 123. Held the *Anderson* court: because tortious interference is a "tort claim[]," it "could have been brought under the Tort Claims Act" against the university—i.e., the plaintiffs' employer. *Id.* at 126. Section 101.106(f), then, asks not whether Wilkerson can succeed on the merits, but whether his claim sounds in tort. *See id.*; *see also Franka*, 332 S.W.3d at 381 (noting that a cause of action "could have been brought under the Act" if the "claim is in tort and not under another statute that independently waives immunity").[17]

Because tortious interference (as its name suggests) is a tort, *see Anderson*, 365 S.W.3d at 126, Wilkerson's claim against Glazebrook in her personal capacity is "foreclose[d]," *Franka*, 332 S.W.3d at 381, and can be pursued against only the University, *see Ngakoue*, 408 S.W.3d at 352. The district court should have granted Glazebrook governmental immunity.

\* \* \*

We REVERSE and RENDER on both immunity issues.

---

[17] Again, detaching immunity questions from merits issues makes sense in an interlocutory appeal about immunity. *See BancPass*, 863 F.3d at 397.